[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 27, 2010
JOHN LEY
ACTING CLERK

_____

No. 09-10428

_____

D. C. Docket No. 08-20266-CR-CMA

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ABIMEL CARABALLO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 27, 2010)

Before MARCUS and WILSON, Circuit Judges, and RESTANI,* Judge.

---

* Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

MARCUS, Circuit Judge:

Abimel Caraballo appeals his convictions for alien smuggling and his ensuing sentence. He claims that the district court erred in admitting evidence recovered from an unlawful search, and in admitting a standard INS form taken from the immigration files of the aliens he smuggled, in violation of the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment. Caraballo also challenges his sentence of forty-six months' imprisonment, arguing that the district court made multiple errors in calculating the applicable sentencing range under the United States Sentencing Guidelines. After thorough review, we affirm Caraballo's convictions and his sentence.

I.

The basic facts are these: On August 7, 2007, at approximately 11:30 a.m., City of North Miami Marine Patrol Officer Dagoberto Andollo noticed a twenty-five-foot fishing boat entering Haulover Inlet in Miami, Florida. Using binoculars, he saw several fishing poles of disparate varieties (a heavy trolling rod, a heavy spinning rod, and a light spinning rod) on the boat and two individuals who were looking around nervously and appeared to be scanning the shoreline for law enforcement officers. Officer Andollo saw that once the vessel reached the shore, a black truck with a boat trailer hurriedly backed up to load the boat, and one of the

2

passengers on the boat jumped into the water, waist-deep, to expedite the loading of the vessel onto the trailer. Andollo also saw the driver of the truck, the defendant Abimel Caraballo, exit his vehicle, enter the boat momentarily, and then return to the truck.

Because it was the first day of lobster season, the marine patrol officer was monitoring the Haulover Inlet area to ensure that fishermen were complying with state regulations concerning the number and size of lobsters they were permitted to catch. In particular, he was looking for lobster poachers, who often displayed fishing rods on their boats instead of a dive flag and dive gear in order to avoid notice and inspection. Suspecting that Caraballo's boat was engaged in lobster poaching, Andollo approached the boat and its occupants. He walked up to an individual still on the boat, Anderson Lopez, and asked him if they had caught any fish. Lopez first replied "yes" and then said "no." Asked to clarify his response, Lopez stated that they had not caught any fish because it was a slow day. Andollo then asked Lopez and the other individual on the boat, Edel Miranda, whether they had fishing licenses; they said no. The defendant, Caraballo, who was the driver of the truck, said that he had a license and that there were no fish on board the boat; he did not, however, produce a fishing license.

Andollo asked Lopez to provide identification; Lopez replied that his

3

identification was on the boat. However, the officer could see the outline of Lopez's wallet in his pocket. Andollo asked Lopez to remove the object in his pocket. It was a wallet. Lopez opened it and handed Andollo his identification with shaking, nervous hands.

After receiving inconsistent answers to his questions from Lopez, Miranda, and Caraballo, and noting how nervous Lopez appeared to be, Officer Andollo decided to conduct a fisheries check on board the vessel, and called for assistance from other officers before boarding. After climbing onto the boat, Andollo opened the hatch of the cabin to ensure that no one else was on board who could jeopardize his safety. He observed eleven overheated and frightened passengers tightly packed inside of a small, enclosed cabin. Only one of the passengers could speak English. Ten were Chinese nationals and one was a Guyanese national. None had any immigration papers, and they appeared to the officer to be "extremely scared."

After opening the hatch further and offering the passengers water, Andollo contacted Immigration and Customs Enforcement ("ICE") agents, who took custody of the aliens. They were taken to the Pembroke Pines Border Patrol Station in Pembroke Pines, Florida, where they were interviewed by Customs and Border Patrol Officer Stephen Lloyd Rose. After gathering routine biographical information from each of the aliens based on a set of the same objective questions

4

posed to all aliens upon entry into the United States, Rose completed an I-213 form, entitled Record of Deportable/Inadmissible Alien, for each one.

Customs and Border Patrol Agent Mark Samples arrested and took custody of Caraballo, Lopez, and Miranda. During his post-arrest interview, Miranda told Agent Samples that he and Lopez had told Caraballo only that they were taking the boat for a test run because they were considering purchasing it and that, therefore, Caraballo did not know that they were smuggling aliens. Lopez gave the same answer. The defendant Caraballo also told Agent Samples that he had lent the boat to Lopez and Miranda for a test run and that he had met Lopez several days earlier. Based on that information, Caraballo was released and Lopez and Miranda were arrested.

Samples continued his investigation and obtained records from Lopez's, Miranda's, and Caraballo's mobile telephones as well as from a satellite telephone found on the boat. These records showed that sixteen calls were made between Caraballo and Lopez, and fifteen calls were placed between Caraballo and Miranda on the morning of the alien smuggling venture. In addition, between July 25 and August 3, Caraballo and Lopez called each other fifty-eight times. There were also eight telephone calls that Caraballo made on the morning of the smuggling to the satellite phone on the vessel. The satellite telephone records also revealed that the

5

satellite telephone was in the area of Freeport, Bahamas, on the morning of the smuggling venture.

On May 6, 2008, a federal grand jury, sitting in the United States District Court for the Southern District of Florida, returned a twenty-three count indictment charging Caraballo with (1) conspiring to encourage and induce aliens to come to, enter, and reside in the United States illegally, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count I); (2) knowingly encouraging or inducing an alien to come to, enter, and reside in the United States, in violation 8 U.S.C. § 1324(a)(1)(A)(iv) (Counts II-XII); and (3) bringing aliens to a place other than a designated port of entry, in violation of 8 U.S.C. § 1324(a)(2)(B)(iii) and 18 U.S.C. § 2 (Counts XIII-XXIII).

Soon thereafter, Caraballo moved in limine to exclude the immigration files of the aliens that he smuggled (the "A-Files"), which included the I-213 form completed by Rose, claiming both that they contained inadmissible hearsay and were testimonial in nature, rendering their admission a violation of the Sixth Amendment's Confrontation Clause. The district court granted the motion in part and denied it in part, observing that "[t]o the extent the 'A-Files' include testimonial statements, such statements are inadmissible," but also finding that, generally, the standard pedigree information contained in the A-Files would not

6

violate the Confrontation Clause because it was not testimonial in nature.

Caraballo also claimed that Officer Andollo's search of his boat exceeded his lawful authority under Florida law, and, therefore, the fruits of the search should be suppressed. After conducting an evidentiary hearing, the district court denied the suppression motion, concluding that Andollo had authority under Fla. Stat. § 370.01(6) to enforce Fish and Wildlife Commission laws, and that his authority included the power to search and inspect vessels without a warrant when officers "have reason to believe that fish or saltwater products are taken . . . in violation of laws or rules . . . ." (7/14/2008 Order on Motion to Suppress, Case No. 08-20266-CR, at 6-7). The district court also determined that Andollo had reasonable suspicion to conduct an investigatory stop based on the behavior of Lopez and Miranda, the nature and arrangement of their fishing equipment, and the fact that it was the first day of lobster season. The court also found that the failure of Lopez and Miranda to provide fishing licenses, their conflicting stories, and the manner in which they quickly attempted to trailer the boat to Caraballo's truck, provided Andollo with probable cause to search the vessel. Finally, the district court concluded that the search of the cabin was a constitutionally permissible limited protective sweep.

At trial, co-conspirator Lopez, testified on behalf of the United States that he

7

was first introduced to the alien smuggling venture when Gardino Martinez invited him to meet with the defendant Caraballo. At that time, Caraballo asked Lopez to travel to the Bahamas in order to pick up eleven aliens and transport them to Miami. Lopez said that he, Martinez, Caraballo, and another individual named Ariel met in Caraballo's living room on August 4th to discuss the plan. On August 6th, Lopez had another planning meeting with Caraballo, Miranda, and Ariel, and Lopez and Miranda decided to leave for the Bahamas that evening. Caraballo instructed Lopez how to get to Freeport, how to transport the aliens, that Miranda would be accompanying him, and that Lopez would be paid $7,000 to smuggle the aliens into the United States. Ariel, in turn, provided Lopez with a satellite telephone and a GPS. Notably, Caraballo also required Lopez to sign an agreement stating that, if Lopez was caught by the police or the Coast Guard, he would tell the authorities that Caraballo was simply selling the boat to him and knew nothing about the alien smuggling plan. Caraballo also purchased fuel, bait, ice, and water for Lopez to use during the journey. Finally, Lopez testified that Caraballo had organized three other similar illegal alien smuggling trips, and that Lopez participated in each of them and had been paid for his services.

The second co-conspirator, Edel Miranda, also testified against Caraballo. His account was consistent with that of Lopez. Miranda added that he was asked

to participate in the alien smuggling operation by his roommate, Martinez, and that, before they left for the Bahamas, Caraballo instructed him to go to the marina first to ensure there were no police present. Miranda also testified that, throughout the smuggling trip, he used the satellite phone and his mobile telephone to update Caraballo on their progress and their estimated time of arrival in Miami. Miranda offered that he had previously assisted in Caraballo's alien smuggling ventures by taking some Chinese aliens from Miami Beach to the home of a conspirator, and once at that home, had witnessed Caraballo collecting payment from the Chinese aliens. Miranda had also seen thirteen or fourteen Chinese people at Caraballo's house around August 2nd or 3rd.

Finally, at trial, Border Patrol Officer Rose testified that he interviewed the eleven aliens found in the cabin of the vessel, and then prepared their A-files. An INS A-file, he explained, generally contains an I-213 form which records the alien's basic biographical information and any other immigration documents pertinent to the alien. The government offered at trial only the biographical portion of the I-213 forms of the aliens.

The jury convicted Caraballo of Counts I through XII as charged and of Counts XIII though XXIII on the lesser included offense of violating 8 U.S.C. § 1324(a)(2)(A).

Caraballo's Pre-Sentence Investigation Report ("PSI") set his base offense level at 12, pursuant to U.S.S.G. § 2L1.1(a)(3), which applies to alien smuggling crimes, and added three levels, pursuant to U.S.S.G. § 2L1.1(b)(2)(A), because the offense involved eleven aliens. The PSI then increased the offense level to 18 because the offense intentionally or recklessly created a substantial risk of death or serious bodily injury to another, pursuant to U.S.S.G. § 2L1.1(b)(6), and by another two levels because Caraballo acted as an organizer or leader, pursuant to U.S.S.G. § 3B1.1(c). Accordingly, the PSI concluded that Caraballo had a total offense level of 20 and a criminal history category of I, yielding a Guidelines range of thirty-three to forty-one months' imprisonment.

Prior to sentencing, Caraballo filed written objections to his PSI, arguing, inter alia, that he should not be given a two-level enhancement for intentionally or recklessly creating a substantial risk of death or serious bodily injury because there was ample space for the aliens in the cabin of the boat; that he should not be given an enhancement as a leader; and that he should be awarded an acceptance of responsibility deduction because he went to trial only to contest the constitutionality of 8 U.S.C. § 1324(a)(2)(B)(iii). He reiterated these arguments at his sentencing hearing and offered the testimony of Miranda.

The government also objected to the PSI, arguing that Caraballo should have

received a four-level enhancement for being a leader or organizer of a criminal activity that involved five or more participants (rather than only a two-level enhancement). It presented evidence that Caraballo gave directions to Miranda and Lopez; purchased provisions for the journey including the gas; stayed in constant contact by telephone throughout the entire voyage; instructed Miranda and Lopez what to say in the event they were caught; set Miranda's and Lopez's pay; and instructed them how generally to commit the crime. In addition, the government also suggested that Caraballo had not accepted full responsibility, that the aliens were confined to the boat's cabin during a five-and-one-half-hour ocean voyage in August, and that only three or four flotation devices were actually found on board the vessel.

The district court rejected Miranda's testimony concerning the safety of the aliens on board the vessel, finding it not to be credible. Instead, it relied on photographs taken during the search of the vessel that showed only three life preservers. The district court found that the cabin was not designed to hold eleven people during a five-hour voyage, and, therefore, that the reckless endangerment enhancement pursuant to U.S.S.G. § 2L1.1(b)(6) was fully warranted. The district court also found that a four-level aggravating role enhancement under U.S.S.G. § 3B1.1(a) was appropriate because the evidence demonstrated that Caraballo was a

leader or organizer of a criminal activity involving at least five participants. Finally, the district court determined that Caraballo had not accepted responsibility for his role in the offense, particularly because Caraballo denied his guilt and proceeded to trial on all of the counts of the indictment, not just those involving 8 U.S.C. § 1324(a)(2)(B)(iii). Based on those findings, Caraballo's total offense level was 22 and his criminal history category was I, yielding a Guidelines range of forty-one to fifty-one months' imprisonment and three years of supervised release.

On January 13, 2009, the district court sentenced Caraballo to forty-six months' imprisonment, followed by three years of supervised release as well as a special assessment in the amount of $1,475 and a fine of $2,500. Specifically, the district court imposed a sentence of forty-six months' imprisonment for Counts I through XII and twelve months' imprisonment for Counts XIII through XXIII, all to be served concurrently.

This timely appeal followed.

## II.

Caraballo raises three challenges in this appeal. First, he claims that the district court erred when it denied his motion to suppress all of the evidence obtained during and derived from the search of his boat. Second, he contends that the district court admitted a portion of the smuggled aliens' I-213 immigration

12

forms in violation of both the Federal Rules of Evidence and the Confrontation Clause. Finally, Caraballo says that his sentence should be reversed because the district court miscalculated the applicable sentencing range under the Sentencing Guidelines. We address and reject each of the arguments in turn.

A.    Motion to Suppress

Caraballo argues that the district court erred in denying his motion to suppress all of the evidence recovered from the search of the boat as well as the interviews conducted on board the vessel, because, he claims, Officer Andollo violated the Fourth Amendment when he boarded the vessel and opened the cabin door, revealing eleven aliens.

We review the findings of fact made by the district court for clear error and its application of law to those facts de novo. United States v. King, 509 F.3d 1338, 1341 (11th Cir. 2007). In addition, we may affirm the denial of a motion to suppress on any ground supported by the record. United States v. Mejia, 82 F.3d 1032, 1035 (11th Cir. 1996).

In the first place, as Caraballo conceded, Officer Andollo properly stopped and questioned Lopez, Miranda, and Caraballo at the outset. The interaction was, at most, a brief investigative stop that was clearly supported by reasonable suspicion. See United States v. Lopez-Garcia, 565 F.3d 1306, 1313 (11th Cir.

13

2009). In determining whether there is reasonable suspicion to support the stop, we consider the totality of the circumstances in light of the officer's own experience and evaluate whether the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005) (citation omitted); Lopez-Garcia, 565 F.3d at 1313. An officer may make an investigative stop if "under the totality of the circumstances, from the collective knowledge of the officer[] involved in the stop, [he] had an objectively reasonable suspicion that [the defendant] had engaged . . . in a crime." United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004) (citations and quotation marks omitted).

Here, Andollo's suspicion that Lopez, Martinez, and Caraballo were violating the Florida fisheries laws was supported by several specific, objective, and articulable facts, including the display of inconsistent fishing rods on the boat on the first day of lobster season, the obviously nervous demeanor of Lopez and Miranda as they scanned the shoreline apparently surveilling the area for law enforcement officers upon their approach, and the unusual speed with which the three men attempted to load the boat onto the trailer. Officer Andollo testified that, in his professional experience, the use of such mismatched rods, and the behavior

14

of Lopez, Miranda, and Caraballo during lobster season reasonably suggested that the boat had been used for illegal lobster fishing.

The initial stop was brief and minimally intrusive: Officer Andollo only asked Lopez whether he had been fishing, asked Lopez for his identification, and asked Lopez, Miranda, and Caraballo whether they had a fishing license. Indeed, as we read the record and the district court's findings, the brief questioning would have been proper even if Andollo did not have reasonable suspicion. Law enforcement officers do not violate the Fourth Amendment simply by approaching an individual on the street or in some other public place and asking a question or asking for identification. As the Supreme Court has observed, "[i]f a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Drayton, 536 U.S. 194, 201 (2002). "[T]he simple act of police questioning does not constitute a seizure." United States v. Perez, 443 F.3d 772, 778 (11th Cir. 2006). And, on this record, there was no evidence that Lopez's path was blocked, that his identification was retained, or that he did not understand that the conversation was voluntary. Nor was there any indication that Andollo displayed his weapon, physically touched Lopez, or otherwise altered the language or tone of his voice. See id. ("Factors relevant to this inquiry include, among other things: whether a citizen's path is blocked or impeded; whether identification is

15

retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.") (quotation marks and citation omitted). Thus, the initial encounter suggests no more than a consensual one.

In the second place, as Caraballo also conceded, during his conversation with Lopez, Miranda, and Caraballo, Andollo developed probable cause to believe that the three had violated the fisheries laws of Florida by fishing or lobstering without a license, and that they had engaged in this criminal activity on the vessel that day. See Lopez-Garcia, 565 F.3d at 1314 (holding that the validity of a search and seizure under the Fourth Amendment turns on the presence or absence of probable cause). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." United States v. Smith, 459 F.3d 1276, 1291 (11th Cir. 2006) (citation omitted).

Probable cause was demonstrated by these facts: Again, Andollo observed that the boat was displaying inconsistent types of fishing rods, and that Lopez and Miranda were nervously and obviously scanning the shoreline as their boat approached Haulover Inlet. Andollo testified that these were real signs that indicated violations of the fisheries laws. Then, once at the boat ramp, Lopez,

16

Miranda, and Caraballo were moving as quickly as possible to load the boat onto a trailer. Indeed, Lopez was observed jumping into waist-deep water to expedite the process. While the boat was on the boat ramp to be loaded onto the trailer, Andollo also saw Caraballo get out of the vehicle, enter the boat momentarily, and then return to the truck. When speaking to Andollo, Lopez gave inconsistent answers to the question of whether he had caught any fish. Lopez and Miranda then both said that they did not have fishing licenses, but Caraballo claimed that he had one although it was never produced. And, when Andollo asked Lopez for his identification, Lopez said that his identification was on the boat. Andollo could plainly see, however, the bulge of Lopez's wallet in his pocket. After Andollo asked Lopez whether his identification was in the wallet, Lopez produced the wallet and handed his identification to Andollo. Moreover, when Lopez handed Andollo his identification, he appeared very nervous and his hands were shaking.

When taken in concert, these circumstances yielded a reasonable ground to believe that the defendant and others had unlawfully obtained lobsters and violated the Florida fisheries laws. We add that the exigency of the situation -- Caraballo was about to leave with the boat and any poached lobsters or fish would be easy to dispose of -- made it impossible to seek a warrant in due course. See Carroll v. United States, 267 U.S. 132, 153 (1925) (stating that in conducting "a search of a

17

ship, motor boat, wagon, or automobile . . . it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought"); see also California v. Acevedo, 500 U.S. 565, 569 (1991) (citing Carroll and explaining "[c]ontemporaneously with the adoption of the Fourth Amendment, the First Congress, and, later, the Second and Fourth Congresses, distinguished between the need for a warrant to search for contraband concealed in a dwelling house or similar place and the need for a warrant to search for contraband concealed in a movable vessel.") (internal quotation marks and citation omitted); United States v. Bain, 736 F.2d 1480, 1488 (11th Cir. 1984) ("[T]he mobility of the vessel was an exigent circumstance justifying an immediate search.").

Third, and finally, once on board the vessel, Officer Andollo lawfully conducted a protective sweep that included opening the cabin door to ensure that there were no additional persons on board who could cause him harm. In Maryland v. Buie, the Supreme Court held that a protective sweep may be undertaken lawfully pursuant to an in-house arrest where the officer "possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. 325, 337 (1990). "A 'protective sweep' is a quick and limited search of premises . . . .

It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. at 327; see also United States v. Miller, 430 F.3d 93, 99 (2d Cir. 2005) (agreeing with the First, Seventh, Fifth, Sixth, one panel of the Ninth, and D.C. Circuits that protective searches may be undertaken even without an arrest warrant); see also United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005) ("We hold . . . that police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry."); Leaf v. Shelnutt, 400 F.3d 1070, 1087-88 (7th Cir. 2005) ("[I]t was not necessary for the officers to have made an arrest in order for their search of the apartment to be justified; the only question is whether the search was objectively reasonable."); United States v. Gould, 364 F.3d 578, 584 (5th Cir. 2004) (en banc); United States v. Taylor, 248 F.3d 506, 513 (6th Cir. 2001) ("[T]he principle enunciated in Buie with regard to officers making an arrest – that the police may conduct a limited protective sweep to ensure the safety of those officers – applies with equal force to an officer left behind to secure the premises while a warrant to search those premises is obtained."); United States v. Garcia, 997 F.2d 1273, 1282 (9th Cir. 1993); United States v. Patrick, 959 F.2d 991, 996-97 (D.C. Cir. 1992) abrogated on other grounds by Apprendi v. New Jersey, 530 U.S. 466 (2000); but see United

19

States v. Torres-Castro, 470 F.3d 992, 997 (10th Cir. 2006) (recognizing that, unlike the Tenth Circuit, "a majority of circuits have extended the protective sweep doctrine to cases where officers possess a reasonable suspicion that their safety is at risk, even in the absence of an arrest").

The district court did not err in applying the protective sweep doctrine here. Once Andollo had lawfully boarded the vessel, the conduct of Lopez, Miranda, and Caraballo gave him reason to believe there may have been another person on board. Their answers to Andollo's questions had been inconsistent; Lopez, in particular, appeared extremely nervous; and Caraballo had quickly boarded the boat before they began placing it onto the trailer. Indeed, Andollo had called for back-up from other law enforcement officers because the suspects' conduct made him nervous, and, notably, he did not board the vessel to conduct a search until back-up arrived.

The district court also expressly found that Andollo engaged in the protective sweep to protect himself based upon the nervous behavior of Lopez, Miranda, and Caraballo. Caraballo presented no evidence that the district court's finding of fact on this issue was clearly erroneous. Further, the record does not suggest that the sweep was anything other than a limited protective sweep; Andollo simply opened the door to the one large concealed living area of the boat where

20

another person easily could have been hiding.

Florida state law also authorized Andollo to board the boat, to "open and inspect . . . areas where saltwater products are normally kept aboard vessels," and to open any containers except those found in the sleeping and living areas. Fla. Stat. §§ 379.3313(1)-(2); Hill v. State, 238 So. 2d 608, 611 (Fla. 1970). A person must have a license, permit, or authorization number to take saltwater fish, and the authorization must be in the possession of the person at the time he takes or possesses the saltwater fish. Fla. Stat. § 379.354(1)(a), (3). In fact, under Florida law, an officer does not need probable cause to stop a boat to check for fishing permits. State v. Casal, 410 So. 2d 152, 154-55 (Fla. 1982). And there is no bar to opening a cabin door under that authorization; indeed, such a bar would make no sense as fishing rods and other accouterments are often stored inside of the cabin to protect them from the elements. Further, Andollo did not search any container in the living or sleeping areas of the boat.

Once the cabin door was open, eleven aliens appeared in plain view, huddled in the cabin space of the small craft. Particularly given that they had entered the United States from international waters at a location other than a designated port of entry, the incriminating nature of the scene was readily apparent. Andollo did not violate the Fourth Amendment when he "seized" the eleven aliens crammed into

21

the boat's small cabin.

The district court properly denied the defendant's motion to suppress the fruits of the stop, search, and seizure that ensued on the morning of August 7, 2007 at the Haulover Inlet in Miami, Florida.

B.    Admissibility of the I-213 Forms of the Smuggled Aliens

Caraballo also argues that the district court abused its considerable discretion when it failed to exclude the first page of the aliens' I-213 forms (taken from their A-Files) on two grounds: first, because the evidence was impermissible hearsay under the Federal Rules of Evidence; and, second, because it amounted to testimonial hearsay admitted in violation of Caraballo's Sixth Amendment confrontation rights.  He claims that any evidence the government introduced through the I-213 forms was testimonial in nature because the declarants, the eleven aliens, did not testify at trial.  We remain unpersuaded.

We review evidentiary rulings for an abuse of discretion.  United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990).  However, we review "de novo the question of whether hearsay statements are 'testimonial' for purposes of the Confrontation Clause."  United States v. Lamons, 532 F.3d 1251, 1261 n.15 (11th Cir. 2008).

22

The partial I-213 forms were not admitted in violation of the Federal Rules of Evidence. Hearsay is generally defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). "Hearsay is inadmissible unless the statement is not hearsay as provided by Rule 801(d) or falls into one of the hearsay exceptions." United States v. Baker, 432 F.3d 1189, 1203 (11th Cir. 2005). There is no dispute that the I-213 forms constitute hearsay. However, they fall squarely within an exception to hearsay.

The Rules of Evidence contain an explicit exception for public records and reports containing "matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel." Fed. R. Evid. 803(8)(B). We have already held that immigration files contained in an A-File, a category into which the I-213 form falls, constitute admissible hearsay, because the "admission of routinely and mechanically kept I.N.S. records, such as the I-194 form and warrants of deportation, does not violate Rule 803(8)(B)." United States v. Agustino-Hernandez, 14 F.3d 42, 43 (11th Cir. 1994); see also Renteria-Gonzalez v. I.N.S., 322 F.3d 804, 817 n.16 (5th Cir. 2002) (finding that the I-213 form falls under the public records exception to the hearsay rule).

23

Indeed, the portion of the I-213 form offered by the government and received into evidence by the district court contained only routine biographical information -- the entrant's name, date of birth, place of birth, parents' names, height, weight, address, country of citizenship, and information concerning whether the entrant had an immigration visa. The I-213 form -- entitled a Record of Deportable/Inadmissible Alien Form -- is routinely completed by Customs and Border Patrol agents in the course of their non-adversarial duties, not in the course of preparing for a criminal prosecution. Border Patrol Officer Rose testified that the basic information he collected from the eleven aliens during their interviews at the Pembroke Pines Border Patrol Station is collected from all aliens upon entering the United States, and that the I-213 form is filled out for all aliens who are unable to produce documentation showing that they have lawfully entered the United States. Rose explained that the I-213 forms are routinely prepared and became a permanent part of an alien's A-File. The government offered a redacted portion of the I-213 form only to demonstrate that the aliens found on Caraballo's boat were deportable and inadmissible; Caraballo never questioned the authenticity of these documents. The admission of the redacted I-213 forms did not violate the Federal Rules of Evidence.

Nor did the admission of the I-213 forms violate Caraballo's rights under the

Confrontation Clause. The Confrontation Clause of the Sixth Amendment provides that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford v. Washington, the Supreme Court held that the Confrontation Clause bars the admission of the testimonial statements of a witness who did not appear at trial unless the witness was unavailable and the defendant had a prior opportunity to cross-examine him or her. 541 U.S. 36, 53-54 (2004). While the Supreme Court declined to define what a "testimonial" statement is, id. at 52, it did observe generally that business records are "statements that by their nature were not testimonial," id. at 56. It also described "testimonial" hearsay as being "typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Id. at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). Thus, "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," constitute part of the "core class" of testimony. Id. at 51-52.

In Davis v. Washington, two years later, the Supreme Court elaborated on

25

Crawford, explaining:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822 (2006) (emphasis added). The Supreme Court emphasized that "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Id. at 821. Accordingly, the Supreme Court held that a victim's statements in response to a 911 operator's questions did not constitute testimonial hearsay whose admission was in violation of the Confrontation Clause, because the "primary purpose" of the questioning "was to enable police assistance to meet an ongoing emergency," and the declarant did not make her statements as a witness but, instead, as an individual seeking police assistance in an emergency. Id. at 828.

The Supreme Court revisited the question of what constitutes a testimonial statement in Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009). There, the petitioner objected to the admission of three "certificates of analysis" which showed that the seized substances contained cocaine. In Massachusetts, state law

26

required a forensic analyst, at the request of the police, to test seized evidence for the presence of illegal drugs, and required the analyst to provide the police with his findings under oath. The Supreme Court held that these certificates, which it described as "quite plainly affidavits," were testimonial statements because they were made under oath and under circumstances which would lead an objectively reasonable witness to believe that the statement would be used at a later trial. Indeed, the Supreme Court observed that the sole purpose of the certificates was to provide prima facie evidence at trial. Id. at 2538. Moreover, these certificates were not business records, because the hearsay exception for business records does not extend to cases where "the regularly conducted business activity is the production of evidence for use at trial." Id.

Our Court has also addressed when hearsay is testimonial for Sixth Amendment purposes. We have explained that

> if hearsay is "testimonial," that is, for example, made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, the Confrontation Clause prohibits its admission at trial unless (1) the declarant is unavailable, and (2) the defendant has had a prior opportunity to cross-examine the declarant.

Baker, 432 F.3d at 1203 (quotation marks, citation and footnote omitted). Put differently,

> formal statement[s] to government officers are generally testimonial . .

27

. [as are] affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially. Similarly, extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, and statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, fall within the core class of testimony.

Id. at 1203-04 (quotation marks and citations omitted).

In addition, a panel of this Court determined in United States v. Cantellano, that a warrant of deportation is non-testimonial in nature and not subject to confrontation, because it "is recorded routinely and not in preparation for a criminal trial. It records facts about where, when, and how a deportee left the country." 430 F.3d 1142, 1145 (11th Cir. 2005) (emphasis added). Similarly, the Fifth Circuit, in United States v. Rueda-Rivera, determined that items in a defendant's A-File, particularly a Certificate of Nonexistance of Record, were non-testimonial and analogous to a business record and thus were not barred by Crawford and the Confrontation Clause. 396 F.3d 678, 680 (5th Cir. 2005).

Like a Warrant of Deportation and a Certificate of Nonexistance of Record (and unlike the certificates of analysis in Melendez-Diaz), the basic biographical information recorded on the I-213 form is routinely requested from every alien entering the United States, and the form itself is filled out for anyone entering the

28

Untied States without proper immigration papers. The only evidence in the record on this point comes from the testimony of Rose, and, as we have noted, he said that whenever an alien "lands on United States soil" he asks them for "[b]iographical data, name, date of birth, place of birth, mother and father's name, height, weight, address, U.S. residence, if they have one, immigrant visa information" and "country of citizenship," and that he records that information on an "I-213" form, which he described as a "record of biographical data." (11/3/2008 Trial Tr., at 47). Rose gathered that biographical information from the aliens in the normal course of administrative processing at the Pembroke Pines Border Patrol Station in Pembroke Pines, Florida. (Id.). The redacted I-213 forms that were admitted contained nothing more.

The I-213 form is primarily used as a record by the INS for the purpose of tracking the entry of aliens into the United States. This routine, objective cataloging of unambiguous biographical matters becomes a permanent part of every deportable/inadmissible alien's A-File. It is of little moment that an incidental or secondary use of the interviews underlying the I-213 forms actually furthered a prosecution. The Supreme Court has instructed us to look only at the primary purpose of the law enforcement officer's questioning in determining whether the information elicited is testimonial. See Davis, 547 U.S. at 828, 830

29

(focusing on the primary purpose of the 911 operator's interrogation in determining whether the answers elicited were testimonial). The district court properly ruled that the primary purpose of Rose's questioning of the aliens was to elicit routine biographical information that is required of every foreign entrant for the proper administration of our immigration laws and policies. The district court did not violate Caraballo's constitutional rights in admitting the smuggled aliens's redacted I-213 forms.[1]

[1] Even if the admission of the I-213 forms was in violation of the hearsay rule or the Confrontation Clause, Caraballo's convictions still could not be reversed because any such error would be harmless beyond a reasonable doubt. We will not reverse a conviction based on an evidentiary error "unless there is a reasonable likelihood that [the errors] affected the defendant's substantial rights." United States v. Emmanuel, 565 F.3d 1324, 1332 (11th Cir. 2009); see United States v. Edwards, 211 F.3d 1355, 1359 (11th Cir. 2000) (stating that the harmless error doctrine applies to violations of the Confrontation Clause). For violations of the Confrontation Clause, harmless error occurs where it is "clear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." United States v. Candelario, 240 F.3d 1300, 1307 (11th Cir. 2001) (quotation marks and citation omitted).

In United States v. Gari, we held that the admission of I-213 forms in support of alien smuggling charges was harmless beyond a reasonable doubt. 572 F.3d 1352, 1362-63 (11th Cir. 2009). We explained that "[t]he I-213 forms do not contain statements harmful to the defense that are not cumulative of other evidence admitted at trial," because officers testified about the same facts included in the forms, such as their observation of the defendants's boat and the group of people disembarking from the vessel, the discovery of thirty-four Cuban nationals on that same day, the lack of immigration records for those thirty-four people, and the fact that the explanation the aliens provided for their arrival in the United States was improbable and not supported by any evidence. Id. at 1363-64. Also, we explained that there could be no prejudice arising from the fact that the I-213 forms were the only evidence of the aliens' identities, because no such identification is required to support alien smuggling offenses. See id. at 1363 n.9.

Here, the I-213 forms did not contain any non-cumulative evidence harmful to the defense. The presence of eleven people, only one of whom could speak English, crammed into the closed cabin of a twenty-five-foot boat on an August day in South Florida, arriving at a boat ramp that is not a Designated Port of Entry, taken together, is a powerful indication that those individuals are illegally entering the country. Moreover, Lopez and Miranda unambiguously testified that they knew they were engaging in an alien smuggling venture and they never asked to see their passengers' documentation. There was no dispute about the alienage of the

30

C.    Sentencing Guidelines Calculation

Caraballo also contends that the district court clearly erred in enhancing his sentence for reckless endangerment, pursuant to U.S.S.G. § 2L1.1(b)(6), for his role as a leader/organizer of a conspiracy involving at least five participants, pursuant to U.S.S.G. § 3B1.1(a), and for refusing to award him a reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a).  We remain unpersuaded.

We accept the district court's factual findings at sentencing unless clearly erroneous, and we review the application of the Sentencing Guidelines to the facts de novo.  United States v. Rodriguez-Lopez, 363 F.3d 1134, 1136-37 (11th Cir. 2004).

First, we hold that the district court did not clearly err by applying the sentencing guideline enhancement for intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person.  Id. at 1137 (explaining that the decision about whether the defendant created a risk of death or serious injury to the aliens he transported is a factual finding that we review for clear error).

---

individuals found on the boat and government witnesses had independently established that Miranda and Lopez had picked them up in the Bahamas and transported them by small boat to the United States.

31

A district court may enhance a sentence by two levels if the defendant created, either intentionally or recklessly, a substantial risk of death or serious injury to the alien whom he has smuggled or transported, unless the resulting offense level is less than 18, in which case the total offense level is increased to 18. U.S.S.G. § 2L1.1(b)(6). The commentary explains that reckless conduct "includes a wide variety of conduct (e.g., transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded, dangerous, or inhumane condition." U.S.S.G. § 2L1.1 cmt. n.5[2]; see also Rodriguez-Lopez, 363 F.3d at 1138 (explaining that this "provision applies to an array of factual scenarios and should be applied flexibly . . . [to include] circumstances where alien smugglers subject others to crowded, dangerous, or inhumane condition[s]") (citation and quotation marks omitted).

In Rodriguez-Lopez, we upheld the application of a sentencing guidelines enhancement for the creation of a substantial risk of death or serious injury where an alien smuggler transported twenty-two Cuban nationals on a small boat between Cuba and the Florida Keys that was not equipped with a sufficient number of life

_____

[2] The commentary and application notes of the Sentencing Guidelines are authoritative unless they are plainly erroneous, inconsistent with the regulation they interpret, or contrary to the Constitution or federal law. Stinson v. United States, 508 U.S. 36, 45 (1993); United States v. Torrealba, 339 F.3d 1238, 1242 (11th Cir. 2003).

32

jackets. Id. at 1137-38. We explained that such conduct was equivalent to transporting aliens on roadways without sufficient seats or seatbelts, conduct that many of our sister circuits have found sufficient to support the application of this enhancement. Id. at 1138.[3]

Here, Caraballo smuggled eleven aliens on a five-and-one-half-hour open water voyage from the Bahamas to Miami in August in a small and enclosed cabin, on a twenty-five-foot fishing boat that was not equipped with nearly enough life jackets. Indeed, Andollo testified that the aliens were "packed like sardines" in the cabin and sweating badly. These conditions are undeniably dangerous and inhumane. During the search of the boat, only three life jackets were found on board and the government presented photographic evidence of the three life jackets. While Miranda testified for the defendant that there were enough life vests in the cabin for all of the aliens, he could not remember the exact number or describe them, and the district court was well within its discretion to discount

---

[3]See, e.g., United States v. Cuyler, 298 F.3d 387, 391 (5th Cir. 2002) ("Aliens who are unrestrained easily can be thrown from the bed of the pickup in the event of an accident or other driving maneuver of the sort that is unavoidable in highway driving."); United States v. Ramirez-Martinez, 273 F.3d 903, 916 (9th Cir. 2001) (holding that application of the enhancement was appropriate where the defendant transported twenty people in a van without seats or seat belts); United States v. Ortiz, 242 F.3d 1078, 1078-79 (8th Cir. 2001) (affirming application of the enhancement when the defendant transported twenty-three aliens in a van equipped with seat belts for only fourteen).

33

Miranda's testimony, as it plainly did.[4]

The aliens would have likely died or suffered serious injuries if the boat had capsized or if they had fallen overboard in the open seas without a flotation device. The district court did not clearly err in applying the § 2L1.1(b)(6) enhancement to Caraballo's guidelines calculation.

Second, the district court did not clearly err in applying a leadership role enhancement to Caraballo's guidelines calculation. See United States v. Ramirez, 426 F.3d 1344, 1355 (11th Cir. 2005) (we review a district court's determination that a defendant is subject to a §3B1.1 role enhancement for clear error). Pursuant to U.S.S.G. § 3B1.1(a), a district court may increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." In determining whether a defendant is an organizer or leader, we examine several factors,

---

[4] The district court stated:

I am persuaded that the two level increase should apply here. First, I did not find the witness' testimony credible with respect to his perception of the number of life jackets on board the vessel. The photographs which were taken contemporaneously with the seizure of the vessel and the aliens and those who were operating the vessel show three life jackets, not 11. The defendant did not count them before. He didn't know how many there were. I don't know how he can then say that there was [sic] sufficient number of jackets for these folks who were inside the cabin. That is a very small compartment.

(1/13/2009 Sentencing Tr., at 16).

34

including these:

> (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

United States v. Gupta, 463 F.3d 1182, 1198 (11th Cir. 2006) (quoting U.S.S.G. § 3B1.1, cmt. n.4). "There is no requirement that all of the considerations have to be present in any one case." Ramirez, 426 F.3d at 1356. Rather, these factors are offered for the sentencing judge's consideration. Id.

In many of the cases where we have affirmed a finding that a defendant played a leadership or organizational role under U.S.S.G. § 3B1.1(a), there was evidence that the defendant had recruited participants, had instructed participants, or had wielded decision-making authority. United States v. Ndiaye, 434 F.3d 1270, 1304 (11th Cir. 2006) (affirming role enhancement under § 3B1.1(a) where the defendant "exercised authority over the organization by recruiting and instructing co-conspirators"); United States v. Suarez, 313 F.3d 1287, 1294 (11th Cir. 2002) (affirming role enhancement under § 3B1.1(a) where the defendant gave orders to other agents, oversaw the movement and distribution of illegal drugs, and possessed decision-making authority); United States v. Mesa, 247 F.3d 1165, 1168-69 (11th Cir. 2001) (affirming a role enhancement under §3B1.1(a) where the

defendant "controlled and directed" others in the transportation of illegal drugs and claimed a larger share of the profits than other participants).

Caraballo argues that he was not an organizer or a leader of a criminal activity involving five or more participants because he merely owned the boat used to smuggle the aliens. However, the government presented evidence, which the jury, and then the sentencing judge, obviously credited -- that Caraballo recruited Lopez to participate in the smuggling operation; the smugglers met at Caraballo's home to discuss the crime; Caraballo gave Lopez and Miranda specific instructions on how to commit the crime; Caraballo had Lopez and Miranda sign a contract agreeing to tell a fabricated story to the authorities if they were caught; Caraballo contacted Miranda and Lopez thirty-nine times by telephone during the smuggling trip, and contacted Lopez fifty-eight times by telephone between July 25 and August 3; Caraballo financed the trip (including the purchase of 180 gallons of gasoline); and Caraballo agreed to pay Lopez $7,000 for his role in the smuggling venture.

The government also presented evidence that at least five individuals participated in the conspiracy; at sentencing, the government cited Lopez's trial testimony that he, Caraballo, Miranda, Martinez, and Ariel attended planning meetings. See United States v. Wilson, 884 F.2d 1355, 1356 (11th Cir. 1989)

36

("The findings of fact of the sentencing court may be based on evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing."). The district court could find on this record that Caraballo was a leader and organizer of this criminal alien smuggling operation and that there were at least five participants involved in the operation. The district court did not clearly err in applying the four-level leadership enhancement.

Third, and finally, the district court did not clearly err in declining to apply an acceptance of responsibility reduction to Caraballo's Sentencing Guidelines calculation. See United States v. Kendrick, 22 F.3d 1066, 1068 (11th Cir. 1994) ("The district court's determination of whether a defendant is entitled to a reduction for acceptance of responsibility is a finding of fact that is entitled to great deference on appeal and will not be disturbed unless clearly erroneous.").

Under U.S.S.G. § 3E1.1(a), a sentencing guidelines calculation reduction of two levels is available if the defendant "clearly demonstrates acceptance of responsibility for his offense." We have explained that, "[t]he Sentencing Guidelines provide that a defendant who shows remorse or contrition for his crimes is entitled to a reduction of his sentence if the sentencing court finds that he has accepted responsibility for the crime." United States v. Rodriguez, 959 F.2d

193, 195 (11th Cir. 1992).  This

> adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.  Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction.  In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).  In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1 cmt. n.2.  It is also clear that a defendant has not accepted responsibility where he proceeded to trial and "consistently attempted to minimize his role, despite . . . evidence to the contrary."  United States v. Rubio, 317 F.3d 1240, 1244 (11th Cir. 2003).

Caraballo argues, nonetheless, that he should have received the deduction because he went to trial only to preserve a constitutional objection to the validity of the statute, 8 U.S.C. § 1324(a)(2)(B)(iii), and that, after trial, he wrote a letter to the Probation Office accepting responsibility for the crimes for which he had been convicted.  The argument is unpersuasive.  Notably, Caraballo contested his guilt on all of the charges brought against him, not just those contained in Counts XIII through XXIII, and he continuously maintained that his only involvement in the

38

operation was lending his boat to Lopez and Miranda and that he was nothing more than an innocent bystander. In fact, even in the letter he sent to the Probation Office after he was tried and convicted, Caraballo again attempted to minimize his role despite ample proof to the contrary, and admitted only that he gave Miranda and Lopez use of his boat. Again, the district court did not clearly err in calculating Caraballo's applicable guideline range.

In short, we affirm the determinations of the district court in all respects.


**AFFIRMED.**