[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10296
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-20356-JAL-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WISLY TOUSSAINT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 28, 2015)

Before TJOFLAT, HULL and WILSON, Circuit Judges.

PER CURIAM:

After a jury trial, Wisley Toussaint appeals his convictions and total 168-month sentence imposed for conspiracy to commit fraud, in violation of 18 U.S.C. § 1029(b)(2); trafficking in and using an unauthorized access device, in violation of 18 U.S.C. §§ 1029(a)(2) and 2; possession of 15 or more social security numbers, in violation of 18 U.S.C. §§ 1029(a)(3) and 2; and five counts of possession and transfer of a means of identification of another during and in relation to a felony offense, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2.

Toussaint's convictions stem from an undercover investigation in which two confidential informants ("CI") working for the government, Lency Jeudy and Evans Polo, purchased stolen personal identity information from Toussaint, ostensibly to use the information to file fraudulent tax returns for the 2013 tax year. After careful review of the trial record, we affirm.

## I.  CONFRONTATION CLAUSE

On appeal, Toussaint argues that the district court erred in admitting some of CI Jeudy's statements to Toussaint in recorded conversations in violation of the Confrontation Clause.

The Sixth Amendment's Confrontation Clause bars the admission of out of court statements that are "testimonial" unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.  Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365 (2004); see also United

States v. Caraballo, 595 F.3d 1214, 1226 (11th Cir. 2010).  However, "the Confrontation Clause prohibits only statements that constitute impermissible hearsay," and "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  United States v. Jiminez, 564 F.3d 1280, 1286-87 (11th Cir. 2009) (quotation marks omitted).  Thus, "if a trial court admits a statement, made by an available declarant whom the defendant has not had an opportunity to cross-examine, for purposes other than for the truth of the matter asserted, the admissibility of that statement does not violate the Confrontation Clause."  Id. at 1287.

CI Jeudy did not testify at trial.  Instead, Federal Bureau of Investigations Special Agent Tom Ryan, who monitored all but one of the recorded conversations as they occurred, testified about 35 recorded conversations involving Defendant Toussaint and the two CIs that occurred between late October 2013 and late January 2014.  In addition, transcripts of the 35 conversations were published to the jury. [1]

Because CI Jeudy was available to testify but did not appear at trial, Toussaint contends that the admission of five of CI Jeudy's statements in recorded conversations with Toussaint violated the Confrontation Clause.  The five

---

[1]Because these conversations were conducted in Haitian Creole, the jury was given transcripts of the conversations translated into English.  The parties stipulated that the transcripts and their English translations were true and accurate recordings of the conversations.

3

statements occurred during a series of conversations in January 2014 in which CI Jeudy arranged to buy stolen personal identifying information from Defendant Toussaint. Toussaint, in turn, coordinated with a third man, whose source had stolen the information from a mental health treatment center in Philadelphia. Defendant Toussaint instructed CI Jeudy to set up an email account to receive the stolen information and send him an email from that account. Later, after Toussaint was paid, Toussaint instructed the third man by telephone to send an email with the stolen information. Two such email transactions occurred, one on January 18, 2014 and the other on January 31, 2014, for which Toussaint received a total of $1,000.

In the five challenged statements, CI Jeudy: (1) asserted that he needs the stolen information and complains that Toussaint has not yet called his connection; (2) said he needs a lot of information and asks Toussaint to find out from his connection how much it will costs; (3) complained again that Toussaint has not found any information; (4) confirmed that he had set up the email account and would have the money to pay Toussaint by Friday, and asked Toussaint if he should send his email address; and (5) urged Toussaint to make sure the connection sends good information.[2]

---

[2]The five statements by CI Jeudy were as follows:
1. "The thing that I need is the stuff, the information. Do you understand? Like you told me you were going to call the guy. You never called him." Toussaint responded, "Oh, I

4

Setting aside whether CI Jeudy's five statements are "testimonial" within the meaning of Crawford, the district court did not err in admitting them because they were not impermissible hearsay.  This Court recently concluded in United States v. Rivera, 780 F.3d 1084, 1092 (11th Cir. 2015), that the hearsay rule does not operate to exclude a confidential informant's half of a conversation with the defendant where those statements are either "(1) non-assertive statements that are incapable of being true or false or (2) statements that are indisputably false."  As we explained, the confidential informant's portion of the conversation was important to "provide[ ] a context to assess [the] Defendant's response," and "to show the effect those statements had on [the] Defendant . . . ."  Id. at 1092-93.

The five statements Toussaint challenges, like the confidential informant's statements in Rivera, either were non-assertive statements that are incapable of being either true or false, or they were indisputably false, and they were all admitted to place Toussaint's own responses and conduct in context.  The only arguably truthful factual assertion was CI Jeudy's statement that he had created an

---

called this man.  This man's telephone is still cut off.  He told me he is having a problem with his wife. He kicked the woman out last night."
2. "I will need a lot.  Ask this man how much he will charge, man, for it. You hear?" Toussaint responded, "Well, there is no problem."
3. "You said you would for me.  So you have not found them yet?"  Toussaint responded, "Yeah. I found them for you. The guy has 1,500."
4. "Yes.  I did it.  What do you want me to do?  Send it to you?  So listen, I will have all the money on Friday.  Can this guy send me everything?"  At the end of this conversation, Toussaint instructed Jeudy to send Toussaint his email address, which Jeudy later did.
5. "Make sure he gives me good stuff."  Toussaint replied, "Yeah. They come from Philadelphia."

5

email account to receive the stolen information.  However, Special Agent Ryan testified that he was with CI Jeudy when the email account was created, and print outs from the email account were admitted into evidence.  Thus, the government did not need CI Jeudy's recorded statement to prove this fact, and instead offered CI Jeudy's recorded statement only to show the effect it had upon Toussaint, and not for its truth.  See id. (concluding that the confidential informant's one truthful factual statement—that her husband had offered the defendant money to keep him silent—was not hearsay because other witnesses testified about this fact and thus the confidential informant's recorded statement was not admitted for its truth but to show its effect on the defendant).

Because these five statements were not impermissible hearsay—that is, they were not admitted to prove the truth of the matters asserted—their admission did not violate the Confrontation Clause.  See Jiminez, 564 F.3d at 1286-87.[3]

## II.  ENTRAPMENT INSTRUCTION

Troussaint next argues that the district court erred in denying Toussaint's requested jury instruction on entrapment.

The failure to give a particular "instruction is reversible error where the requested instruction (1) was correct, (2) was not substantially covered by the

---

[3]Toussaint concedes that he did not ask the district court for a limiting instruction.  See Rivera, 780 F.3d at 1093 (noting that the defendant should have, but did not, request a limiting instruction).

6

charge actually given, and (3) dealt with some point in the trial so important that the failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Eckhardt, 466 F.3d 938, 947-48 (11th Cir. 2006).[4]

An entrapment defense has two elements: (1) the government induced the crime and (2) the defendant lacked predisposition to commit the crime before the inducement. United States v. Orisnord, 483 F.3d 1169, 1178 (11th Cir. 2007). In order to be allowed to present an entrapment defense, a defendant bears the initial burden of production as to the element of governmental inducement. United States v. Sistrunk, 622 F.3d 1328, 1333 (11th Cir. 2010). If the defendant meets his initial burden of production, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. Id. The sufficiency of the defendant's evidence of governmental inducement is a legal issue to be decided by the trial court. Id. at 1332-33. When considering whether the defendant satisfied his initial burden of production, this Court accepts the testimony most favorable to the defendant. United States v. Wolffs, 594 F.2d 77, 80 (5th Cir. 1979).

---

[4]Although this Court typically reviews a district court's refusal to give a requested jury instruction for an abuse of discretion, it is unclear whether we review a district court's decision not to give an entrapment instruction based on the defendant's failure to produce sufficient evidence of governmental inducement de novo or for an abuse of discretion. See United States v. Sistrunk, 622 F.3d 1328, 1333 (11th Cir. 2010) (collecting cases). We need not decide the issue here because, under either standard, the district court properly denied the instruction.

7

A defendant can show inducement by the producing evidence sufficient to create a jury issue "that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995) (quotation marks omitted). The defendant meets this burden if he produces evidence that the government's conduct included some form of persuasion or mild coercion. Id. The defendant may show persuasion with evidence that he "had not favorably received the government plan, and the government had to 'push it' on him, or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate." United States v. Ryan, 289 F.3d 1339, 1344 (11th Cir. 2002). However, the government's mere suggestion of a crime or initiation of contact is insufficient to demonstrate inducement. Brown, 43 F.3d at 623.

In this case, the district court concluded that Toussaint failed to show government inducement. The recorded conversations proffered at trial showed that Toussaint was a willing participant in the offenses and did not show any coercion or persuasion. See Brown, 43 F.3d at 623 (explaining that the government's initiation of contact or suggestion is not enough to show inducement). Rather, Toussaint's own statements during the conversations showed that he was not induced to commit the crimes. Ryan, 289 F.3d at 1345 (explaining that

8

inducement requires an opportunity to commit the crime "plus something like excessive pressure").

Although Toussaint testified at trial, even accepting his testimony as true, Toussaint did not meet his burden to show government inducement.  Toussaint testified that throughout the summer of 2013, Jeudy and Polo repeatedly called and visited him, asking for help setting up a fraudulent tax preparation business. Toussaint testified that although he always refused, he realized they were not going to stop bothering him.  Toussaint finally agreed to participate because he thought they would leave him alone and because he was afraid of them due to their criminal records.  However, Toussaint admitted that Jeudy and Polo never threatened him.

In short, even according to Toussaint, Jeudy and Polo's repeated requests for help occurred over the summer of 2013, before the government's use of Jeudy and Polo as confidential informants began in October 2013.  Given that Jeudy and Polo were not government informants at that time, nothing they said then could qualify as government conduct.[5]

In any event, the district court's refusal to give the instruction was not reversible error because Toussaint was able to proffer a defense.  See Eckhardt,

---

[5]The government began investigating Jeudy and Polo in 2012.  In late October 2013, Jeudy and Polo became confidential informants and allowed the government to record their conversations with Toussaint.

466 F.3d at 947-48 (explaining that there is reversible error only when the failure to give an entrapment instruction "seriously impaired the defendant's ability to conduct his defense").  Among other things, Toussaint's counsel argued the entrapment issue to the jury in closing argument, and the jury was able to consider the defense, Toussaint's testimony, and the recorded statements to determine whether Toussaint's claim of entrapment had merit.

## III.  RELEVANT CONDUCT

Toussaint contends the district court clearly erred in finding that another tax-fraud conspiracy involving Toussaint and both CIs for the 2012 tax year was relevant conduct under U.S.S.G. § 1B1.3 for purposes of calculating Toussaint's advisory guidelines range.

"When calculating a defendant's sentencing range under the Guidelines, the sentencing court must consider all 'relevant conduct' as defined in [U.S.S.G.] § 1B1.3."  United States v. Siegelman, 786 F.3d 1322, 1332 (11th Cir. 2015). "[R]elevant conduct is broadly defined to include both uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence."  Id. Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and "all reasonably foreseeable acts and omissions of others in furtherance of" jointly undertaken criminal activity "that were part of the same course of conduct

10

or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(1), (2); see also U.S.S.G. § 1B1.3, cmt. n.3.

"For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3, cmt. n.9(A). "Accordingly, we consider whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." Siegelman, 786 F.3d at 1333 (quotation marks omitted).[6] We also consider the "similarity, regularity, and temporal proximity between the offense of conviction and the uncharged conduct." United States v. Maxwell, 34 F.3d 1006, 1011 (11th Cir. 1994) (quotation marks omitted).

Here, the district court included as relevant conduct another stolen identity refund fraud scheme that occurred in the prior tax year (2012) and involved Defendant Toussaint, the CIs Jeudy and Polo, and a woman named Whitney McCoy ("the McCoy scheme"). According to testimony at sentencing, in the McCoy scheme, Toussaint approached Jeudy and Polo about obtaining an electronic filing number (EIFN) in their names, but neither could do so because

---

[6]This Court reviews a district court's determination that an act qualifies as relevant conduct for clear error. United States v. Valarezo-Orobio, 635 F.3d 1261, 1264 (11th Cir. 2011).

11

they had criminal records.  Instead, Jeudy and Polo recruited McCoy as a "junky"

for that purpose.  Toussaint, meanwhile, recruited Rosemond Jeanty to provide the

software necessary to use the EIFN.  The conspirators then filed over 500

fraudulent tax returns using stolen personal identifying information, seeking more

than $1,000,000 in refunds and the IRS paying about $317,000.

It was during the undercover investigation of the McCoy scheme that agents

learned of Toussaint.  Jeudy and Polo subsequently agreed to become confidential

informants in an investigation of Toussaint during the 2013 tax year.  During the

recorded conversations between Toussaint and the CIs, they spoke about the

McCoy scheme from the prior year, with Toussaint boasting that McCoy did not

know how much money they had made.  Toussaint also told the CIs that Rosemond

Jeanty would again help with software.

In light of this evidence, the district court did not clearly err when it found

that the earlier McCoy conspiracy was part of a common scheme or plan.  The two

schemes were substantially similar and temporally connected.  First, the McCoy

scheme involved a stolen identity refund fraud scheme during the 2012 tax season

and the instant offenses were committed ostensibly to facilitate a similar stolen

identity refund scheme for the following tax season.  See U.S.S.G. § 1B1.3 cmt.

n.9(b) (noting that the "same course of conduct" includes consideration of the

nature of the offenses, listing as an example tax fraud, which would only occur at

yearly intervals). Second, the two conspiracies involved common accomplices. Jeudy, Polo, and Toussaint were involved in both frauds. And, Toussaint enlisted Jeanty's assistance in both schemes. Third, the two schemes had similar modus operandi. In the McCoy scheme, Toussaint used Polo and Jeudy to find a "junky" whose identification they could use to obtain an EFIN and file fraudulent tax returns. In the instant case, Toussaint obtained personal identity information, and he instructed Polo and Jeudy to find another "junky" to obtain an EFIN. In both cases, they relied on Jeanty to obtain the software for the EFIN.

Toussaint relies on United States v. Maxwell, 34 F.3d 1006 (11th Cir. 1994), but the facts of Maxwell are distinguishable. In Maxwell, this Court concluded that a cocaine distribution scheme more than one year earlier was not relevant conduct to a dilaudid distribution scheme because it did not involve any of the same parties except the defendant, was temporally remote, and was not sufficiently similar except that both instances were drug offenses. 34 F.3d at 1011. Here, unlike in Maxwell, the two tax fraud schemes were connected by at least two common factors—the same accomplices and the same modus operandi—and were temporally close, one following on the heels of the other.

In sum, the district court did not err in concluding that the McCoy conspiracy was relevant conduct under § 3B1.1(a)(2) and considering that conduct in calculating Toussaint's advisory guidelines range.

13

For the foregoing reasons, we affirm Toussaint's convictions and sentences.

**AFFIRMED.**