[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14529
_____

D.C. Docket No. 1:15-cr-20865-KMM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUSTO JONAH SANTOS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 9, 2020)

Before ROSENBAUM, TJOFLAT and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Justo Jonah Santos appeals his convictions for procuring naturalization unlawfully, in violation of 18 U.S.C. § 1425(a), and misuse of evidence of an unlawfully issued certificate of naturalization, in violation of 18 U.S.C. § 1423.  On appeal, Santos challenges some of the district court's evidentiary rulings and also argues that the trial evidence was insufficient to support his § 1425(a) conviction.  After review and with the benefit of oral argument, we affirm.

## I.  FACTUAL BACKGROUND

### A.    Santos's 2007 Application for Naturalization

A native of the Dominican Republic, defendant Santos became a lawful permanent resident of the United States in 1982, when he was 12 years old.  On July 27, 2007, Santos, then age 37, applied for naturalization.

To that end, Santos completed a N-400 Application for Naturalization (hereinafter "Form N-400 Application" or "Application"), which is a standard form that all individuals must submit to the government to become a naturalized citizen. In a section titled "Good Moral Character," Santos certified under penalty of perjury that he had never been arrested for any reason (Question 16), had never been charged with committing a crime (Question 17), had never been convicted of a crime (Question 18), and had never been in jail or prison (Question 21).  Santos

did not provide any information in the section asking for more details about his prior criminal history, including the "City, State, Country" of any arrest or charge

The Application also required Santos to report the amount of time he spent outside the United States since becoming a lawful permanent resident in 1982, specifically, any trips that lasted longer than 24 hours. In response, Santos listed these six trips to the Dominican Republic and Nicaragua: (1) an 11-day trip to the Dominican Republic in July 2003; (2) a 2-day trip to the Dominican Republic in November 2003; (3) an 11-day trip to Nicaragua in 2004; (4) a 3-day trip to the Dominican Republic in September 2007; (5) a 3-day trip to the Dominican Republic in April 2007; and (6) a 15-day trip to Nicaragua in June 2007. Notably, Santos did not report taking any trips before 2003. Santos also did not disclose that he had previously used any other names or aliases. Santos signed his Form N-400 Application directly below a certification that its contents were true and correct.

**B.    Santos's 2009 Interview and Re-signing of Form N-400 Application**

On January 26, 2009, United States Citizenship and Immigration Services ("USCIS") Officer Lucas Barrios interviewed Santos. During the interview, Officer Barrios annotated in red ink Santos's Application with handwritten checkmarks and comments, which included clarifications and corrections to Santos's answers. Officer Barrios checked in red ink each of Santos's answers

regarding his criminal history and wrote "claims no arrest[,] no offense[,] no DUI" under Santos's answers.  Officer Barrios also checked in red ink each of Santos's answers regarding his history of trips outside the United States and wrote "claims no other" below the list of trips.  Using red ink, Officer Barrios numbered his corrections to the application 1 through 8 and then signed the Application.

At the end of the interview, Santos again swore and certified under penalty of perjury that the contents of the Application, including Officer Barrios's eight corrections, were true and correct.  Santos again signed the Application in black ink, this time below that second certification.

After the interview, Officer Barrios approved Santos's Application, and Santos became a naturalized citizen in February 2009.  In March 2009, Santos used his certificate of naturalization to obtain a U.S. passport.

During the naturalization process, however, Santos failed to disclose in his Application and interview: (1) that he had a prior conviction for voluntarily killing a person, (2) that he had traveled to the Dominican Republic in 1986 and stayed there for over two years, and (3) that he used an alias name while in the Dominican Republic.  Specifically, in November 1986, Santos was involved in killing another Dominican national named Jose Martinez Tavarez in New York City.  Soon thereafter, in December 1986, Santos left the United States and returned to the Dominican Republic.  In February 1988, Dominican police arrested Santos for

4

Martinez's death.  At the time he was arrested, Santos was carrying a false identification document in the name of "Junior de Jesus Abinader."  Santos then spent one year in a Dominican prison and was eventually found guilty of voluntarily killing Martinez, in violation of "Articles 295-321," and 326 of the Dominican penal code.  In March 1989, Santos was released from prison and, in April 1989, he returned to the United States.

## C.    Santos's December 2015 Statement

After investigating Santos's criminal records in the Dominican Republic and his travel history with U.S. Customs and Border Patrol, the Department of Homeland Security arrested Santos on December 16, 2015 on the immigration-related charges in this case.  On the day of his arrest, Santos provided a sworn post-<u>Miranda</u> statement to Special Agent Mildred Laboy.  Special Agent Laboy documented Santos's answers to her questions on a handwritten form entitled "Record of Sworn Statement in Affidavit Form."  The statement read, in part:

Q. What is your true and complete name?
A. Justo Jonah Santos Abinader

Q. What is your date and place of birth?
A. [redacted month and day] 1970 Santiago, Dominican Republic

. . .

Q. Have you ever been arrested any where [sic] in the world?
A. Yes.

Q. When and why were you arrested?

5

A. 1987 arrested for murder in Puerto Plata, Dominican Republic

Q. Where [sic] you convicted of murder?
A. Yes manslaughter and was given time served – a little over one year

Q. Have you ever been arrested other than 1987[?]
A. No

Q. When did you become a U.S. citizen?
A. 2009

Q. On your Application for Naturalization form N400, page 8 Section D #15, Have you ever committed a crime or offense for which you were not arrested and #16, Have you ever been arrested, cited or detained by any law enforcement officer (including USCIS or former INS and military officers) for any reason?
A. When I completed my naturalization application, I was under the mind set [sic] that the question in the application related to the U.S. Now that you have explained the Questions-I understand and I should have placed a yes on Questions [sic] #16.

Q. What about Question #17, where it states Have you ever been charged with committing any crime or offense?
A. Yes, I understand today, I should have said yes to Question 17.

Q. Question #18 on your naturalization, is Have you ever been convicted of a crime or offense?
A. I should have said yes to Question #18 because I was given time served for the charge.  I don't want to continue any more questions.

At the end of the 2015 interview, Santos refused to sign the statement.

**D.   Indictment and First Jury Trial**

In May 2016, a federal grand jury indicted Santos on one count of procuring citizenship or naturalization unlawfully, in violation of 18 U.S.C. § 1425(a) (Count

6

One), and one count of misusing evidence of citizenship or naturalization, in violation of 18 U.S.C. § 1423 (Count Two).  Santos was tried twice.

Prior to Santos's first trial, the government filed a motion in limine about Santos's post-Miranda statement to Special Agent Laboy.  The government planned to elicit testimony from Special Agent Laboy that Santos admitted he was arrested for murder and convicted of manslaughter in the Dominican Republic in 1987, and that he served over one year in prison.  But the government sought to prevent Santos from eliciting testimony about the rest of Santos's statement to Special Agent Laboy.  Santos had said as follows: when he completed the Application, he thought the questions about his criminal history related only to the United States, but that after Special Agent Laboy explained the questions to him, he understood that he should have answered yes to those questions.

Santos opposed the motion, arguing that the government was seeking to admit the incriminating portions and exclude the exculpatory portions of his post-Miranda statement.  Santos contended that the rest of his statement should be admitted under, inter alia, Federal Rules of Evidence 106 and 611(a) and the rule of completeness because both portions pertained to the issue of whether Santos acted knowingly.

After hearing arguments, the district court granted the government's motion in limine, concluding, <u>inter alia</u>, that the exculpatory portion of Santos's statement was not necessary to clarify or explain the inculpatory portion.

After a five-day trial, a jury convicted Santos of both counts. The district court imposed a total 15-month prison sentence, followed by two years of supervised release. The district court also revoked Santos's citizenship.

## E.    First Appeal and Remand

Santos appealed. In light of <u>Maslenjak v. United States</u>, 582 U.S. __, 137 S. Ct. 1918 (2017), the parties jointly moved this Court for summary reversal, asserting that the district court erred in instructing the jury that the government did not need to prove that Santos's false statement was material to his obtaining naturalization to convict Santos under 18 U.S.C. § 1425(a). A three-judge panel of this Court agreed, granted the motion for summary reversal, vacated the order revoking Santos's citizenship, and remanded for further proceedings.

## F.    Second Jury Trial

After remand, Santos moved in limine to admit the entirety of his post-<u>Miranda</u> statement. The government again opposed Santos's request. After Santos's criminal case was transferred to another district court judge, that judge denied Santos's motion in limine.

8

At trial, the parties stipulated that: (1) in December 1986, Santos left New York for the Dominican Republic; (2) in February 1988, he was arrested by the Dominican Republic police; (3) he remained in a Dominican jail until March 3, 1989; (4) he returned to the United States on April 2, 1989; and (5) while in the Dominican Republic, he "acquired and possessed false identification documents in the name of Junior de Jesus Abinader" and used that name.

The government introduced, among other exhibits: (1) translated copies of Santos's conviction records from the Dominican Republic showing that he was charged with causing the death of Jose Martinez Tavarez, he was "found guilty of violating Articles 295-321 of the [Dominican penal code] and 326 of the [penal code]," and he was sentenced to one year in prison; and (2) translated portions of the Dominican penal code, including Articles 295, 321 and 326, which the parties stipulated were in effect in 1989.[1]

---

[1]The government introduced translated excerpts of the Dominican penal code, including: (1) Articles 295 to 300, which cover voluntary homicide (Article 295), homicide with premeditation or stalking (Article 296), parricide (Article 299), and infanticide (Article 300); and (2) Articles 319 to 328, which cover involuntary homicide (Articles 319 and 320), and when homicide is excusable (Articles 321 and 323) and self-defense (Article 328). The government's excerpts omitted Articles 301 to 318.

Under Article 295, "He who voluntarily kills another, is guilty of homicide." Article 321 states, "Homicide, injuries and blows are excusable, if there was a preceding immediate provocation, threats or severe violence by the offended party." Article 326 provides that "[w]hen the circumstance of excuse is proven, the punishment will be reduced" to six months to two years in prison for a crime warranting a 30-year punishment and to three months to one year in prison for any other crime.

Special Agent Laboy testified, describing her 2015 arrest of Santos and his post-Miranda statements to her.  Special Agent Laboy testified, without objection, that Santos admitted to her that he had been (1) arrested in the Dominican Republic, (2) charged with murder but convicted of manslaughter, and (3) sentenced to a little over one year in prison.

USCIS Officer Barrios, who conducted Santos's naturalization interview, did not testify at trial.  Instead, Natalie Diaz, another USCIS officer with ten years of experience, including adjudicating over one thousand applications, testified.  Officer Diaz testified generally about the process by which "adjudications officers" approve or deny naturalization applications.  According to Diaz, to obtain naturalization, an alien files a Form N-400 application, appears for a non-waivable interview, provides documentation and then, if approved by an adjudications officer, is naturalized.  Once signed, an alien's Form N-400 becomes part of his "A-file," which the immigration authorities use to perform a background check before conducting the interview.  USCIS consults only United States databases for this process, relying entirely on the applicant to disclose information about foreign convictions.

During the interview, the adjudications officer places the alien under oath and reviews the entire Form N-400 application with the alien, marking in red ink the answers the officer confirms and any changes and corrections the alien makes

during the interview. According to USCIS policy, the applicants complete the Form N-400 with black ink and the adjudications officers use red ink during the interview, so that the officers' markings are easily distinguishable from those of the applicants. Adjudications officers are required by the policy to use checkmarks when they confirm answers and, at the end of the interview, the officers must have applicants sign the Form N-400 application a second time in blue or black ink and agree to any changes made by the adjudicators. Per the policy, if an adjudications officer does not ask an applicant certain questions, the officer is not supposed to mark that question on the application. The policy does not require an adjudications officer to confirm answers when the questions clearly do not pertain to the applicant. Providing false testimony under oath during the interview is ground for an alien's ineligibility to naturalize, regardless of whether the lie is about something material to obtaining naturalization.

Over Santos's objections based on "hearsay, confrontation, [Rule] 403," Officer Diaz was given Santos's annotated Form N-400 Application and read to the jury what Officer Barrios had written on it in red ink. Officer Diaz confirmed that, at the interview, Santos signed the annotated Form N-400 Application, thereby agreeing and certifying that Officer Barrios's corrections numbered 1 through 8 were correct. Santos does not dispute that he signed the Form N-400 Application, which looks like this:

**Part 13. Signature at Interview.**

I swear (affirm) and certify under penalty of perjury under the laws of the United States of America that I know that the contents of this application for naturalization subscribed by me, including corrections numbered 1 through __8__ and the evidence submitted by me numbered pages 1 through __✓__ , are true and correct to the best of my knowledge and belief.

Subscribed to and sworn to (affirmed) before me

**LUCAS F. BARRIOS**

JAN 2 6 2009

| Complete Signature of Applicant | Officer's Printed Name or Stamp | Date (mm/dd/yyyy) |
|---|---|---|
| | Officer's Signature | |

**Part 14. Oath of Allegiance.**

If your application is approved, you will be scheduled for a public oath ceremony at which time you will be required to take the following oath of allegiance immediately prior to becoming a naturalized citizen. By signing, you acknowledge your willingness and ability to take this oath.

Officer Diaz testified that Officer Barrios's marks and signature in red ink on the annotated Form N-400 were consistent with USCIS policy.

While Officer Diaz acknowledged that she did not adjudicate Santos's Form N-400 Application, she explained that USCIS's background check into Santos's criminal history yielded no results. Ultimately, because Santos met the requirements for English reading, writing, civics, physical presence and residence, and good moral character, Officer Barrios granted his Application for naturalization in January 2009.

Officer Diaz opined, however, that based on her review of the evidence, Santos's N-400 Application would have been denied if USCIS had known about his criminal history in the Dominican Republic. When an applicant has a prior foreign conviction, the adjudications officer will look for an equivalent crime under United States federal law. Officer Diaz determined that the federal equivalent of Santos's Dominican conviction was voluntary manslaughter, which is a crime involving moral turpitude for immigration purposes.

12

Office Diaz identified several ways in which Santos's criminal conviction in the Dominican Republic rendered him ineligible for naturalization, including that: (1) Santos's re-entry into the United States in 1989 was unlawful because he was convicted of a crime involving moral turpitude while he was outside the country, which is ground for removal; (2) Santos was convicted of a crime involving moral turpitude less than five years after he entered the United States, which is also ground for removal; (3) Santos abandoned his lawful permanent resident status when he left the United States in 1986, stayed in the Dominican Republic for over two years, and obtained false identity there, which also made him removable; and (4) per USCIS policies, Santos's lies on his Form N-400 Application rendered him ineligible for naturalization, regardless of whether the lies were material.

On cross-examination, Officer Diaz admitted that she did not know how long Santos's naturalization interview lasted, what questions Officer Barrios asked, or how Santos responded to them. Officer Diaz further admitted that, because she was not present during the interview, she did not know if Officer Barrios followed USCIS policy and asked all the questions he checked off. Officer Diaz conceded that her conclusions about Santos's eligibility for naturalization were her own opinion, but they were also "conclusion[s] that a reasonable adjudicator would have come to." Officer Diaz agreed that, for immigration purposes, the federal crime of involuntary manslaughter, unlike voluntary manslaughter, was not

13

automatically a crime involving moral turpitude because it required individual analysis of the actual record of conviction.

In his defense, Santos called an immigration expert, Linda Osberg Braun, a private immigration attorney who had previously worked for the United States Immigration and Nationality Service. Braun testified about the procedures, and some of the pitfalls, of the naturalization application and interview process.

According to Braun, USCIS has information officers who help applicants during the citizenship process, but the officers are not legally trained and can give bad advice. In addition, notaries and travel agents, some of whom are operating scams, often help applicants fill out Form N-400s even though they are not supposed to do so, and do not sign their names as the preparers at the bottom of the document. When Braun is reconstructing a client's travel history for a Form N-400 application, she uses the client's passport, if possible, but before September 11, 2001, it was common for stamps to be missing from passports, which made reconstructing travel difficult. The government, on the other hand, has much better access to the applicant's travel history, and, if her client is confronted with an inaccuracy, they will correct it during the interview. Braun asks her clients about their criminal history in many different ways because her clients often do not understand what she is asking and initially do not tell her about past arrests or convictions.

In Braun's experience, there is a range of competence among USCIS adjudicators. Adjudicators must work hard to handle a certain number of files each day and hit their goals. Not every adjudications officer goes through every question during the interview and, in some cases, an adjudicator's denial of an N-400 is determined to be incorrect in later appeals.

Contrary to Officer Diaz's view, Braun testified that USCIS would not have found Santos to be disqualified from naturalization had the agency known of his travel to, and criminal history in, the Dominican Republic. Braun opined that Santos did not abandon his lawful permanent residence status when he went to the Dominican Republic in 1986 for over two years because he did not form the subjective intent to do so. Braun stressed that Santos was a minor when he was arrested in 1988, his parents remained in the United States, and Santos returned immediately to the United States upon his release from prison and has remained in the United States since. In Braun's experience, a juvenile was not considered to have abandoned his lawful permanent residence status unless his parents' intent to abandon their U.S. residency was imputed to him.

Braun also disputed that Santos's Dominican conviction was for a crime of moral turpitude. Braun said that it was unclear which statute Santos was convicted of violating because his conviction records show he was "found guilty of violating articles 295 through 321," with a dash separating the two numbers. Those articles

15

include crimes due to "ineptitude, recklessness, inadvertence, negligence, or regulatory noncompliance," not all of which are crimes involving moral turpitude. In Braun's opinion, Article 321 is a self-defense or "excusable offenses" statute, the violation of which also would not be a crime involving moral turpitude. Braun said Articles 295 and 321 were inconsistent because one appeared to be a homicide statute and the other an excusable homicide statute, and defendants could not be convicted of both in the United States. In short, Braun opined that there was not enough information in the record to determine if Santos was convicted of a crime involving moral turpitude or lacked good moral character.

Braun also said that because Santos was a minor when he was convicted, his conviction could be treated as juvenile delinquency, which would not be a conviction for immigration purposes. Further, because Santos had not committed any crimes in the five years prior to his 2007 naturalization application, Braun believed he would not be permanently disqualified from naturalizing.

On cross-examination, Braun agreed that (1) the notations in red ink on Santos's Form N-400 Application were "in accordance with USCIS procedures," (2) it was not USCIS's responsibility to uncover undisclosed foreign convictions, (3) the USCIS relies upon applicants to truthfully answer questions on the Form N-400 Application, (4) the applicant has the burden to establish his eligibility for naturalization and is required to present certified conviction records to meet that

16

burden, and (5) if the applicant's records are not clear or comprehensive, the applicant's Form N-400 Application would be denied.[2]

After Santos rested, the government recalled Officer Diaz for rebuttal. Among other things, Officer Diaz testified that Santos's conviction records indicated he was found guilty of violating only Articles 295 and 321, despite the dash between 295 and 321, because otherwise Santos would have been found guilty of killing his parents, his children, and all the crimes in between."[3]  Officer Diaz explained that she believed Santos was convicted of voluntarily killing another, under Article 295, and Article "321 is just a reduced version of that[,] . . . because there was an excuse, the provocation."  Officer Diaz did not believe that Article 321 constituted an involuntary homicide statute because Dominican law has a separate self-defense statute.  Officer Diaz concluded the equivalent federal crime in the United States was voluntary manslaughter because Article 295 pertained to the voluntary killing of another.  Officer Diaz said she did not need more information about Santos's Dominican Republic convictions to determine he was convicted of a crime involving moral turpitude.

---

[2]Santos also called Yamil Martin, an investigator for the Federal Public Defender's Office, who testified that he went to Officer Barrios's residence to interview him, but Officer Barrios would not cooperate and closed the door on the investigator.

[3]See supra note 1.

In addition, Officer Diaz said the fact that Santos was a juvenile when he left the United States in 1986 did not change her opinion that he abandoned his lawful permanent residence status because: (1) juveniles, like adults, can abandon their status; (2) Santos killed the victim in 1986 and, four days later, left the United States for the Dominican Republic and stayed for over two years; and (3) Santos acquired false identification and used an alias in the Dominican Republic in order to remain there undetected.  Officer Diaz maintained that she would have concluded that Santos lacked good moral character to be naturalized because he omitted information on his Form N-400 Application, as marked by Officer Barrios and signed under oath by Santos a second time, and the content and substance of those omissions all related to Santos's three years in the Dominican Republic and "the reason was he was in jail for having killed someone."

The district court denied Santos's motions for a judgment of acquittal.  The jury found Santos guilty on both counts.  The district court imposed concurrent sentences of time served, plus two years' supervised release.[4]  Upon the government's motion, the district court revoked Santos's citizenship as a result of his convictions.

---

[4]According to the Federal Bureau of Prison's website, Santos was released from prison on October 30, 2018, and is currently serving his term of supervised release.

## II.  SANTOS'S FORM N-400 APPLICATION

On appeal, Santos argues that the district court erred in admitting the Form N-400 Application with Officer Barrios's marks in red ink because it was hearsay and not subject to any hearsay exception.[5]  We refer to the Form N-400 Application with Officer Barrios's red marks as the "annotated Form N-400" Application.  As explained below, the annotated Form N-400 was (1) admissible non-hearsay as an adopted admission of a party-opponent under Federal Rule of Evidence 801, and, (2) alternatively, was properly admitted under the public record hearsay exception in Federal Rule of Evidence 803.

### A.    Rule 801(d) Nonhearsay

The Federal Rules of Evidence generally prohibit the admission of hearsay statements at trial.  Fed. R. Evid. 802.  "Hearsay is a statement, other than one made by a declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted."  United States v. Rivera, 780 F.3d 1084, 1092 (11th Cir. 2015); see Fed. R. Evid. 801(c).

However, Rule 801(d) identifies statements that are "not hearsay" and thus not prohibited by the hearsay rule.  Fed. R. Evid. 801(d).  Under Rule

---

[5]This Court reviews a district court's evidentiary rulings for an abuse of discretion. United States v. Wilk, 572 F.3d 1229, 1234 (11th Cir. 2009).  "An abuse of discretion occurs if the district court applies an incorrect legal standard or makes findings of fact that are clearly erroneous."  Id.

801(d)(2)(A), an opposing party's own out-of-court statements that are offered against him are not hearsay.  Id.  Likewise, under Rule 801(d)(2)(B), a statement is not hearsay if it is offered against a party and the party manifested that he adopted the statement or believed it to be true.  Fed. R. Evid. 801(d)(2)(B).  To be admissible as an adoptive admission under Rule 801(d)(2)(B), the statement: (1) "must be such that an innocent defendant would normally be induced to respond," and (2) "there must be sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." United States v. Joshi, 896 F.2d 1303, 1311-12 (11th Cir. 1990) (quotation marks omitted) (concluding defendant's nod of the head in response to codefendant's statement that the defendant was a partner in a drug importation scheme was an adoptive admission).

The first criterion is particularly relevant when the defendant is alleged to have acquiesced in another's statement by his silence.  Id.; see, e.g., United States v. Carter, 760 F.2d 1568, 1579-80 (11th Cir. 1985) (involving defendants who remained silent in the back seat of a car while the declarant in the front seat made statements implicating them in a drug smuggling scheme).  Where the defendant has responded affirmatively to the statement, however, the focus is on the second criterion.  Joshi, 896 F.2d at 1311-12 (explaining that because the defendant was alleged to have responded to the statement by nodding, the first requirement was

20

"not at issue here").  Generally, the district court must make a preliminary finding that the government's evidence is sufficient to meet these criteria.  Id. at 1312.  However, if the district court failed to make the preliminary finding, this Court may affirm so long as there is sufficient evidence in the record to support a reasonable jury's finding that the criteria were satisfied.  Id.

Here, Officer Barrios's red marks on Santos's annotated Form N-400 Application are nonhearsay under Rule 801(d)(2)(B) as an adopted statement by an opposing party.  The evidence of adoption is much clearer here than in Joshi and Carter, as Santos's case did not involve either silence or arguably ambiguous conduct from which a jury must reasonably infer the defendant's knowing acquiescence in the declarant's statement.  Rather, Santos expressly adopted Officer Barrios's corrections in red ink on the Form N-400 by, at the end of the interview, signing Part 13 of the application, swearing or affirming under penalty of perjury that the annotated Form N-400 with those corrections was "true and correct to the best of [his] knowledge and belief."

Notably, Santos never disputed that his signature appears on the annotated Form N-400 Application and did not raise any objection to the authenticity of that document.  Further, Santos was able to read and write in English, as evidenced by his passing the reading and writing test Officer Barrios administered.  Nothing in the record suggests Santos did not understand Officer Barrios's corrections in red

ink when he signed the Application.  Under the circumstances, Santos's adoption of Officer Barrios's corrections in red ink is unequivocal.  See United States v. Garcia, 452 F.3d 36, 39-40 (1st Cir. 2006) (concluding defendant's signature on an affidavit swearing that a handwritten statement by an INS officer was "true and correct" and a "full, true, and correct record of the affiant's interrogation by the INS officer" signaled the defendant's adoption of the handwritten statement); McQueeney v. Wilmington Trust Co., 779 F.2d 916, 930 (3d Cir. 1985) (concluding plaintiff's signature on his Seaman's Service Records, filled out by those who employed him, was an "unequivocal adoption" of the documents' contents for purposes of Rule 801(d)(2)(B)); United States v. Johnson, 529 F.2d 581, 584 (8th Cir. 1976) (concluding an interview statement written by investigating agent and then read and signed by the defendant was "not hearsay" under Rule 801(d)(2)(B)).

A reasonable jury could readily conclude from the government's evidence that Santos saw, understood, and acquiesced in Officer Barrios's statements. Accordingly, the district court did not abuse its discretion in admitting the annotated Form N-400 Application as nonhearsay under Rule 801(d)(2)(B).

**B.    Rule 803(8) Public Records Exception**

Under the Federal Rules of Evidence, hearsay is also admissible if it falls into one of the hearsay exceptions.  United States v. Baker, 432 F.3d 1189, 1203

22

(11th Cir. 2005) ("Hearsay is inadmissible unless the statement is not hearsay as provided by Rule 801(d) or falls into one of the hearsay exceptions."). As relevant here, a public record or statement of a public office is admissible under an exception to the hearsay rule. Fed. R. Evid. 803(8). In particular, a public record or statement of a public office is admissible if it, inter alia, sets out: (1) "a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel," and (2) the party opposing admission "does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)-(B).

On appeal, Santos does not contend that he has shown that "the source of information or other circumstances indicate a lack of trustworthiness" under Rule 803(8)(B). Therefore, our analysis addresses only whether the annotated Form N-400 Application at issue sets out "a matter observed while under a legal duty to report" under Rule 803(8)(A)(ii).

This Court has not addressed whether an annotated Form N-400 naturalization application falls within the public records exception to the hearsay rule. We have held, however, that "routinely and mechanically kept [immigration] records" that are maintained in an alien's A-file may be admitted into evidence under the public records exception. United States v. Agustino-Hernandez, 14 F.3d 42, 43 (11th Cir. 1994) (involving portions of alien's A-file, including warrants of

23

deportation, an order to show cause, and a Form I-194 indicating the alien had previously been warned of the penalties of reentry); see also United States v. Caraballo, 595 F.3d 1214, 1226 (11th Cir. 2010) (involving multiple I-213 Record of Deportable/Inadmissable Alien forms completed by a Customs and Border Patrol agent after interviewing aliens).

In concluding that the admission of several Form I-213s did not violate the rules of evidence, the Caraballo Court emphasized that: (1) the information recorded on the Form I-213s was "routine biographical information"; (2) the Form I-213s were "routinely completed by Customs and Border Patrol agents in the course of their non-adversarial duties, not in the course of preparation for a criminal prosecution"; (3) the agents collected the information "from all aliens upon entering the United States" and filled out the Form I-213 "for all aliens who are unable to produce documentation showing that they have lawfully entered the United States"; and (4) "the I-213 forms are routinely prepared and became a permanent part of an alien's A-File." Id. at 1226.[6]

---

[6]The first page of Form I-213 covers personal information, including: (1) the alien's full name, (2) country of citizenship, (3) passport number and country of issue, (4) U.S. address; (5) date, place, time and manner of last entry and the location where passenger boarded; (6) date and place of birth, (7) visa or social security number, and date of issuance; (8) sex, complexion, and color of hair and eyes, (9) height and weight, (10) occupation, (11) scars and marks, (12) FBI number, (13) marital status, (14) details of apprehension, including method, location, date, and time, (15) status at entry and status when found, (16) length of time illegally in the United States, (17) immigration record, (18) criminal record, (19) name, address and nationality of spouse, (20) number and nationality of minor children, (21) name, nationality and address of father and mother, (22) monies due/property in the United States not in the alien's immediate

Using similar reasoning, the First Circuit concluded that Immigration Form 445, similar to Form N-400 but used later in the naturalization process, falls within Rule 803(8)'s public records exception. United States v. Phoeun Lang, 672 F.3d 17, 23-25 (1st Cir. 2012). An approved naturalization applicant must complete a Form N-445 after his interview, but before his naturalization ceremony. Id. at 20, 22. Form N-445 asks a series of questions, including whether the applicant has been arrested, charged, or convicted of a crime, to confirm the applicant's continuing good moral character between the naturalization interview and the naturalization ceremony. Id. at 20. As with the Form N-400 application, a USCIS officer "must verbally verify with the applicant the accuracy of the applicant's written answers," making red checkmarks on the form per USCIS's policy, and the annotated Form N-445 is kept in the applicant's A-file. Id. at 22.

In Lang, before the First Circuit, the defendant argued that the USCIS officer who interviewed him and marked his Form N-445 was a "law enforcement officer" and therefore his annotations fell within the "law enforcement exception" in Rule 803(8), "which precludes admission of public records in criminal cases for matters observed by police officers and other law enforcement personnel." Id. at 24. The First Circuit assumed, without deciding, that the USCIS officer was a law

---

possession, (23) name and address of current or last U.S. employer, and (24) type of employment, salary, and dates of employment.

enforcement officer but concluded that the law enforcement exception nonetheless did not apply because the "case concerns the introduction of documents related to an administrative proceeding for purposes of determining qualifications for naturalization," not a criminal proceeding.  Id.  As such, the Form N-445 is not created primarily for use in court, but rather for the administration of the agency's affairs.  Id. at 24-25.

The First Circuit in Lang also rejected the notion that the Form N-445 was "produced in an 'adversarial setting'" that would render the USCIS officer's observations unreliable, instead concluding that "form N-445 is 'ministerial, non-adversarial information.'"  Id. at 25.  While acknowledging that "criminal charges can result, if as is the case here, false evidence is elicited on the form," the First Circuit determined that "criminal charges are not the primary purpose of the administrative proceedings surrounding an application for naturalization."  Id.

Here, in light of our own precedent addressing other immigration forms kept in an alien's A-file and the First Circuit's persuasive reasoning as to Form N-445, we conclude that Santos's annotated Form N-400 Application falls within Rule 803(8)'s public records exception to the hearsay rule.  Like the Form I-213 in Caraballo and the Form I-194 and warrants of deportation in Agustino-Hernandez, a Form N-400 is part of an alien's A-file.  All applicants for naturalization must participate in an interview under oath with an USCIS adjudicator to be naturalized.

26

And, during the naturalization interview, the adjudicator, in accordance with USCIS policy and training, reviews the information in the Form N-400 with the applicant, placing a checkmark next to each confirmed answer and noting any corrections using red ink.  At the conclusion of the interview, every applicant must again sign the annotated Form N-400 application in either blue or black ink, certifying under penalty of perjury the accuracy of its contents, including the adjudicator's notations in red ink.[7]

In other words, USCIS adjudicators routinely complete N-400 forms during the course of their non-adversarial duties of processing applications for naturalization.  While a Form N-400 may be introduced in a criminal prosecution, as Santos's application was here, that is not the form's primary purpose.  Rather, the primary purpose of the Form N-400 is to aid USCIS in obtaining and verifying the ministerial information the agency needs to administer the naturalization process.

Santos argues that completion of the Form N-400 application during the naturalization interview cannot be "routine and mechanical" for purposes of Rule 803(8) because "[e]ach interview differs based upon the individual applicant and

---

[7]Both Officer Diaz and defense expert Braun testified that Officer Barrios annotated Santos's Form N-400 and had Santos sign the form again in compliance with USCIS's policy. Santos has never questioned the authenticity of the annotated Form N-400 Application introduced into evidence in his case.

27

adjudicator," which will result in different notations on the form. The fact that each applicant may provide different information to an officer during an interview does not make the process of completing the form non-routine. If that were so, this Court would not have concluded in Caraballo that a Form I-213, which also is completed by an immigration officer based on an interview, is a "routinely and mechanically kept" immigration record for purposes of Rule 803(8). See Caraballo, 595 F.3d at 1226. What matters here is that, in all naturalization interviews, USCIS adjudicators follow the same standard procedure of placing a checkmark in red ink next to each verified answer and noting in red ink any corrections the applicant makes to an answer and then having the applicant sign the application swearing under penalty of perjury that the contents of the Form N-400 with the adjudicator's corrections in red ink is true and correct.

Having determined that Santos's annotated Form N-400 Application was properly admitted, we turn to Santos's alternative argument that the form's admission violated his Sixth Amendment right to confront Officer Barrios.

## C.    Confrontation Clause Claim

The Sixth Amendment protects a criminal defendant's right to confront the witnesses against him. U.S. Const. amend VI. In Crawford v. Washington, the Supreme Court held that the Sixth Amendment prohibits the introduction of out-of-court testimonial statements unless the declarant is unavailable to testify, and the

defendant had a prior opportunity to cross-examine the declarant.  Crawford, 541

U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004).  In Crawford, the Supreme Court

"declined to define what a 'testimonial' statement is" but "observe[d] generally

that business records are 'statements that by their nature were not testimonial.'"

Caraballo, 595 F.3d at 1227 (quoting Crawford, 541 U.S. at 52, 56, 124 S. Ct. at

1354) (citations omitted).  The Crawford Court, although unwilling to provide a

comprehensive definition, identified the "core class" of testimonial statements to

include extrajudicial statements contained in formalized testimonial materials,

"such as affidavits, depositions, prior testimony, or confessions," as well as

"statements that were made under circumstances which would lead an objective

witness reasonably to believe that the statement would be available for use at a

later trial."  Id. at 51-52, 124 S. Ct. at 1364 (quotation marks omitted).[8]

Since Crawford, the Supreme Court has distinguished between

nontestimonial and testimonial statements by focusing on "the primary purpose" of

the questioning that elicited the out-of-court statement, as follows:

> Statements are nontestimonial when made in the course of police
> interrogation under circumstances objectively indicating that the
> primary purpose of the interrogation is to enable police assistance to
> meet an ongoing emergency.  They are testimonial when the
> circumstances objectively indicate that there is no such ongoing
> emergency, and that the primary purpose of the interrogation is to

---

[8]This Court reviews "de novo the question of whether hearsay statements are testimonial for purposes of the Confrontation Clause."  United States v. Lamons, 532 F.3d 1251, 1261 n.15 (11th Cir. 2008).

establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. 813, 822, 828, 126 S. Ct. 2266, 2273-74, 2277 (2006) (emphasis added) (concluding that victim's statements in response to a 911 operator's questions were nontestimonial because the purpose of the questions was to resolve an ongoing emergency); see also Melendez-Diaz v. Massachusetts, 557 U.S. 305, 321-24, 129 S. Ct. 2527, 2538-39 (2009) (concluding that a forensic analyst's sworn certificates given to police showing the results of drug testing were testimonial statements because the sole purpose of the certificates was to provide evidence to be used at trial).  In Davis, the Supreme Court further clarified that a nontestimonial statement, "while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  Davis, 547 U.S. at 821, 126 S. Ct. at 2273.

In Caraballo, this Court applied the "primary purpose" analysis of Crawford, Davis, and Melendez-Diaz and determined that the biographical information in I-213 forms was nontestimonial and thus not barred by the Confrontation Clause. 595 F.3d at 1219, 1226-29.  The Caraballo Court emphasized that Form I-213 recorded "basic biographical information," that Customs and Border Patrol agents "routinely requested from every alien entering the United States" during an interview in order to administer immigration laws and policies, and that the form was "primarily used as a record by the INS for the purpose of tracking the entry of

30

aliens into the United States." Id. at 1228-29. The Court explained that "[i]t is of little moment that an incidental or secondary use of the interviews underlying the I-213 forms actually furthered a prosecution." Id. at 1229; see also United States v. Cantellano, 430 F.3d 1142, 1145 (11th Cir. 2005) (concluding that a deportation warrant is nontestimonial in nature and not subject to confrontation, because it "is recorded routinely and not in preparation for a criminal trial. It records facts about where, when, and how a deportee left the country").

Likewise, the First Circuit, in Lang, determined that a Form N-445, annotated by an adjudications officer, was nontestimonial and thus not subject to the Confrontation Clause either. 672 F.3d at 22-23. The First Circuit stressed that that the "N-445 form, like all others similarly generated," was "a non-testimonial public record produced as a matter of administrative routine, for the primary purpose of determining [the applicant's] eligibility for naturalization." Id.

Here, we conclude that Santos's annotated Form N-400 Application, like the annotated Form N-445 in Lang, is a "nontestimonial public record produced as a matter of administrative routine" and "for the primary purpose of determining [Santos's] eligibility for naturalization." See id. at 22. That is, the circumstances of the naturalization interview objectively indicate that the primary purpose of the interview is to review the Form N-400 with the applicant and verify the applicant's answers so that a determination can be made as to the applicant's eligibility for

31

naturalization.  See Davis, 547 U.S. at 822, 126 S. Ct. at 2273-74.  Indeed, all naturalization applicants are required complete and sign a Form N-400 Application, attend a naturalization interview, and then USCIS adjudications officers perform the same verification process consistent with USCIS's protocol in every naturalization interview.  USCIS officers are not conducting the interviews because they suspect the applicants of crimes and are not making the red marks on the Form N-400s for later criminal prosecution.[9]

Because Officer Barrios's red marks in Santos's annotated Form N-400 Application are not testimonial, they are not governed by Crawford, and their admission cannot violate the Confrontation Clause.  See Davis, 547 U.S. at 821, 126 S. Ct. at 2273 (stating that the Confrontation Clause does not apply to non-testimonial hearsay).[10]

---

[9]Santos cites United States v. Charles, 722 F.3d 1319 (11th Cir. 2013), but that decision has no application here.  In Charles, we concluded that an interpreter's translation of the defendant's statements during an interrogation by a U.S. Customs and Border Patrol agent were testimonial, and we noted that the defendant was detained and suspected of a crime.  722 F.3d at 1323-24.  Because the interpreter's statements were testimonial, the defendant had a Sixth Amendment right to confront the interpreter.  Id. at 1325.  In contrast, there was no interpreter present during Santos's naturalization interview, and Officer Barrios's red marks on Santos's Form N-400 Application reflect Santos's responses made in English.

[10]As a separate and independent basis for affirmance, even assuming arguendo that Officer Barrios's red marks (making corrections based on Santos's responses) were testimonial, Santos adopted them as true and correct, which eliminates any Confrontation Clause problem.

### III.  SANTOS'S POST-<u>MIRANDA</u> STATEMENT

Santos argues that the district court abused its discretion and misapplied the rule of completeness when it permitted the government to elicit testimony from Special Agent Laboy about the inculpatory portion of Santos's post-<u>Miranda</u> statement to her but prohibited Santos from eliciting further testimony about the exculpatory portion of his statement.

Under the common law rule of completeness, an opponent against whom a part of an utterance is admitted may complement it by submitting the remainder, in order to give the jury a complete understanding of the "total tenor and effect of the utterance."  <u>Beech Aircraft Corp. v. Rainey</u>, 488 U.S. 153, 171-72, 109 S. Ct. 439, 451 (1988) (quotation marks omitted).  As partially codified in Federal Rule of Evidence 106, the rule states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  Rule 106 "does not automatically make the entire document admissible" once one portion has been introduced.  <u>United States v. Pendas-Martinez</u>, 845 F.2d 938, 944 (11th Cir. 1988).  Rather, Rule 106 "permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced."  <u>United States v. Simms</u>, 385 F.3d 1347, 1359 (11th Cir. 2004)

(quotation marks omitted). Although Rule 106 on its face applies only to written or recorded statements, this Court has extended the rule to the exculpatory portions of a criminal defendant's post-arrest oral statements. See United States v. Range, 94 F.3d 614, 620-21 (11th Cir. 1996).

Here, we conclude that the later exculpatory part of Santos's statement does not explain or clarify the earlier inculpatory part. In the first part, Santos admitted to Special Agent Laboy in 2015 that he was arrested, convicted, and imprisoned for manslaughter in the Dominican Republic in the 1980s. This admission proved the fact of Santos's prior conviction. That is a separate and different topic from why Santos failed to mention his criminal history both on his Form N-400 Application in 2007 and during his naturalization interview in 2009.

We recognize that the government did not necessarily need this admission to prove Santos's criminal history given that the government introduced Santos's actual criminal records from the Dominican Republic.[11] That, however, underscores why the rest of the statement was about a separate topic and was not necessary to explain or clarify the earlier inculpatory part. We thus cannot say that the district court abused its discretion in admitting the first part of Santos's statement and excluding the rest.

_____

[11]The only additional information in the admission is that Santos was charged with "murder" but ultimately convicted of only "manslaughter." The criminal records do not use this terminology.

34

## IV.  SUFFICIENCY OF THE EVIDENCE AS TO COUNT ONE

On appeal, Santos challenges the sufficiency of the evidence as to only his conviction on Count One, unlawfully procuring naturalization, in violation of 18 U.S.C. § 1425(a).[12]  A person violates § 1425(a) when he "knowingly procures or attempts to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship."  18 U.S.C. § 1425(a).  When a naturalized citizen is convicted under § 1425(a), his citizenship is automatically revoked.  8 U.S.C. § 1451(e); see Maslenjak, 582 U.S. at __, 137 S. Ct. at 1923.  The word "procures" in the statute means "obtains," and the phrase "contrary to law" "specifies how a person must procure naturalization so as to run afoul of the statute: in contravention of the law—or, in a word, illegally."  Id. at __, 137 U.S. at 1924-25.

In Maslenjak, the Supreme Court held that § 1425(a)'s "contrary to law" element requires not only that the defendant committed some illegal act in the course of procuring naturalization, but that the defendant's illegal act "played some role in" the acquisition of naturalization.  Id. at __, 137 S. Ct. at 1923, 1925.  When the government claims that the defendant procured naturalization illegally by

---

[12]This Court reviews de novo challenges to the sufficiency of the evidence.  United States v. Wilchcombe, 838 F.3d 1179, 1188 (11th Cir. 2016).  "The evidence, viewed in the light most favorable to the government, must be such that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."  Id. (quotation marks omitted).  When the government relied upon circumstantial evidence, reasonable inferences, but not speculation, will support the conviction.  United States v. Martin, 803 F.3d 581, 587 (11th Cir. 2015).

making a false statement under oath in a naturalization proceeding, in violation of 18 U.S.C. § 1015(1),[13] the government must "demonstrate[e] that the defendant lied about facts that would have mattered to an immigration official, because they would have justified denying naturalization or would predictably have led to other facts warranting that result." Id. at __, 137 S. Ct. at 1923. In other words, the materiality of the false statement is an element of the offense. See id. at __, 137 S. Ct. at 1923-24. Under Maslenjak, a person violates § 1425(a) if he: (1) knowingly makes; (2) a false statement under oath in a naturalization proceeding (in violation of § 1015(1)); (3) that "played some role in" (i.e., was material to); (4) the person's procuring naturalization. See id. at __, 137 S. Ct. at 1926-27.

Here, as in Maslenjak, the government's theory was that Santos procured naturalization "contrary to law" by knowingly making false statements in his Form N-400 Application. While Santos does not dispute that he procured naturalization and that, in doing so, he made false statements under oath in his Form N-400, he nevertheless argues that the government's trial evidence was insufficient to prove beyond a reasonable doubt: (1) that he knowingly made these false statements, or (2) that his false statements were "material" to his procuring naturalization. We address each argument in turn.

---

[13]A person violates § 1015(a), when he "knowingly makes any false statement under oath, in any case, proceeding, or matter relating to, or under, or by virtue of any law of the United States relating to naturalization, citizenship, or registry of aliens." 18 U.S.C. § 1015(a).

**A.    Mens Rea Element – Knowingly Made**

Here, the nature of the false statements themselves strongly indicates they were knowingly made.  Indeed, Santos does not dispute that in his Form N-400 Application, he falsely stated: (1) in Part 1C, that he had not used another name, when in fact he had used the name Junior de Jesus Abinader and obtained a false identification card in that name in the Dominican Republic; (2) in Part 7C, that he had not taken any trips outside the United States before 2003, when in fact he had travelled to the Dominican Republic in December 1986 and had not returned to the United States until April 1989; and (3) in Part 10D, that he had never been arrested (Question 16), charged with committing a crime (Question 17), convicted of a crime (Question 18), and been in jail or prison (Question 21), when in fact he had been arrested, charged, and convicted of voluntarily killing Jose Martinez Tavarez in the Dominican Republic in 1988 and had served one year in prison.  The facts Santos omitted are not minor details, and all are connected to this one episode in Santos's life when he killed Jose Martinez Tavarez.  These are not the kind of facts a person could easily forget, but they are the kind of facts an applicant for naturalization might worry would imperil his application.

In fact, the government presented evidence that Santos himself twice signed the Form N-400 Application with these false statements in it.  Santos signed in Part 11 of the Form N-400 on July 26, 2007, when he submitted the application and

37

then in Part 13 on January 26, 2009, when Officer Barrios conducted his naturalization interview. Each time, Santos swore or affirmed under penalty of perjury that the contents of the Form N-400 containing these false statements was true and correct. Further, a reasonable jury could readily conclude Santos himself prepared the Form N-400 Application because Santos does not deny signing it and the Application did not identify (in Part 12) any other person who prepared the form on Santos's behalf.

No evidence was presented at trial to suggest Santos did not understand the questions or answers in the Form N-400 when he filled it out or each time he signed it. At a minimum, absent some other evidence, the jury could reasonably infer that Santos was fully aware of his own travel history, criminal history, and use of an alias in the Dominican Republic, when he filled out and signed his Form N-400 application. Moreover, because the Form N-400 asked for the "Country" of any arrests and charges, the jury reasonably could have rejected the idea that Santos did not know he needed to report his foreign criminal history. In addition, even if Santos omitted his foreign criminal history because he thought the form did not ask for it, that does not explain why Santos also omitted his travel to and from, and multi-year stay in, the Dominican Republic or the alias he used while in the Dominican Republic. The fact that the other two omitted pieces of information are

38

connected to his undisclosed criminal history supports a reasonable inference that all three omissions were intentional.

All of these circumstances together are more than sufficient to support a jury's finding that Santos knowingly made the false statements in his Form N-400 Application.

## B.    Materiality Element

As to materiality, under Maslenjak, the government must show a "means-end connection" or "causal influence," between the defendant's false statement made under oath and his naturalization.  Id. at __, 137 S. Ct. at 1923, 1925-27.  This is an objective inquiry focusing on whether "knowledge of the real facts would have affected a reasonable government official properly applying naturalization law."  Id. at __, __, 137 S. Ct. at 1923, 1928.

The Supreme Court set forth two ways this causal link could be shown.  Under the first way, which we will refer to as the disqualifying-fact theory, the real facts "are themselves disqualifying" such that "the official would have promptly denied [the] application" for citizenship had they been known.  Id. at __, 137 S. Ct. at 1928.  Under this approach, "there is an obvious causal link between the defendant's lie and [his] procurement of citizenship."  Id.  As examples, the Supreme Court cited an applicant who does not disclose travel history disrupting the period of physical presence in the United States or who lies about having a

conviction for an aggravated felony and thus fails to establish good moral character, both of which are statutorily required, objective legal criteria for citizenship. Id. at __, 137 S. Ct. at 1928-29 ("[W]hen the defendant misrepresents facts that the law deems incompatible with citizenship, her lie must have played a role in her naturalization.").

Under the second way, called the "investigation-based theory," the real facts, while not themselves disqualifying, "could have led" immigration officials to discover other disqualifying facts that would have justified denying the citizenship application. Id. at __, 137 S. Ct. at 1929 (quotation marks omitted). When relying on the investigation-based theory, the government "must make a two-part showing": (1) "that the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials, seeking only evidence concerning citizenship qualifications, to undertake further investigation"; and (2) "that the investigation would predictably," but not definitively, "have disclosed some legal disqualification." Id. (quotation marks omitted). However, even if the government meets this burden, the defendant retains a complete defense to § 1425(a) by showing qualification for citizenship. Id. at __, 137 S. Ct. at 1930.

Here, although the government relied on both methods to prove the materiality of Santos's false statements to his eligibility for naturalization, either method is sufficient to sustain Santos's conviction.

## C.    Disqualifying-Fact Theory

Officer Diaz testified that a reasonable USCIS adjudications officer, knowing the real facts, would have deemed Santos ineligible for citizenship and denied his naturalization application.  In that regard, to be statutorily eligible for naturalization, a person must have been "lawfully admitted for permanent residence in the United States."  8 U.S.C. § 1427(a).  Officer Diaz offered three different reasons why Santos would have been deemed not "lawfully admitted" at the time of his application.  First, when Santos reentered the United States in 1989, he had been convicted of a crime involving moral turpitude, which rendered him removable under 8 U.S.C. §§ 1182(a)(2)(A)(i)(I) and 1229a(e)(2).  In addition, because Santos committed a crime involving moral turpitude in 1986, within five years of his original admission to the United States in 1982, he also was removable under 8 U.S.C. §§ 1227(a)(2)(A)(i) and 1229a(e)(2).  Finally, Santos was not "lawfully admitted" in 1989 because Santos had abandoned his lawful permanent residence status when he left the United States and lived in the Dominican Republic for over two years using an alias, which made him removable under 8 U.S.C. § 1101(a)(13)(C)(i).

41

According to Officer Diaz, another ground for denying Santos naturalization was that he lacked "good moral character."  To be statutorily eligible for naturalization, a person must have been, and still be, "a person of good moral character."  8 U.S.C. § 1427(a).  An applicant lacks good moral character if he gives "false testimony for the purpose of obtaining" naturalization.  8 U.S.C. § 1101(f)(6).  Officer Diaz opined that Santos would have been deemed lacking in good moral character because he provided false oral testimony about his travel, criminal history, and use of an alias during his naturalization interview with Officer Barrios.

## D.    Investigation-Based Theory

As for the alternative investigation-based theory, Officer Diaz testified that USCIS relies on the naturalization applicant to report his foreign criminal history in the Form N-400 and that disclosure of a prior conviction can lead to further investigation.  Officer Diaz said that if Santos had answered "yes" instead of "no" to any of the Form N-400 questions about his criminal history, the adjudications officer would have investigated the nature and disposition of his crime, including asking Santos for documents relating to his criminal proceedings.  In other words, Santos's proper disclosure of his prior arrest, conviction, or one-year sentence in the Dominican Republic for voluntarily killing Jose Martinez Tavarez would have prompted a reasonable USCIS adjudicator to investigate further and that

42

investigation predictably would have uncovered one or more legal disqualifications from naturalization.  By failing to disclose on his Form N-400 his criminal history and the almost three years he spent in the Dominican Republic, Santos cut off important lines of questioning that would have led a USCIS adjudications officer to investigate his past criminal conduct and lawful permanent residence status.

To be sure, Santos presented expert testimony from Braun disputing many of Officer Diaz's opinions, such as whether a USCIS officer would have considered Santos's conviction in the Dominican Republic to be a crime involving moral turpitude or would have deemed Santos to have abandoned his lawful permanent resident status by staying in the Dominican Republic under an alias for several years.  However, the jury was free to credit Officer Diaz's testimony over Braun's testimony on these points.[14]  See, e.g., United States v. Feliciano, 761 F.3d 1202, 1206 (11th Cir. 2014); United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999); United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997).

Further, under Maslenjak, the government did not need to prove beyond a reasonable doubt that Santos's Dominican conviction qualified as a crime of moral

---

[14]We reject Santos's argument that the "plain letter language" of Santos's Dominican records "clearly contradicted" Officer Diaz's testimony that Santos's conviction for "excusable homicide" equated to a federal conviction for voluntary manslaughter, which is categorically a crime involving moral turpitude.  Santos interprets the hyphen in "Article 295-321" to mean 295 through 321 and thus any of the offenses in those 26 sections.  However, Officer Diaz's interpretation of Santos's records of conviction—that the hyphen did not mean 295 through 321, but rather 295 and 321, and therefore Santos was convicted of excusable homicide—is a reasonable one, and the jury obviously agreed with her.

43

turpitude. Rather, the government had to prove beyond a reasonable doubt that a reasonable USCIS officer adjudicating Santos's Form N-400 Application, knowing about Santos's Dominican conviction, would have denied the Application. Notably, even Santos's own expert testified that if an applicant for naturalization failed to provide criminal records clearly showing that the conviction was not disqualifying, the USCIS would deny the application because the burden is on the applicant to establish his eligibility for naturalization. Thus, if Santos had checked "yes" to any of the questions in the criminal history portion of the Form N-400 Application and then produced the Dominican records of conviction at the officer's request, the officer would have denied Santos's application because those records, according to Santos's own expert, were ambiguous and Santos could not establish his eligibility for naturalization.

Based on Officer Diaz's testimony and the other evidence presented at trial, including Santos's signed Form N-400 Application and his criminal records from the Dominican Republic, the jury could have found beyond a reasonable doubt that a reasonable USCIS officer, possessing the true facts, either would have denied Santos's application outright, or would have investigated further and then denied his application, on one or more grounds of ineligibility. See United States v. Friske, 640 F.3d 1288, 1291 (11th Cir. 2011) ("A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the

jury to find the defendant guilty beyond a reasonable doubt." (quotation marks omitted)).

Accordingly, we conclude the government presented sufficient evidence to support the jury's guilty verdict on Count 1.

## V.  CONCLUSION

For all these reasons, we affirm Santos's convictions and sentence.

**AFFIRMED.**